Jack STANLEY, Thomas A. Warren, Isom Meyers, and Hubert Stanley, Appellants,

v.

**UNITED STATES of America,** Appellee.

No. 12969.

United States Court of Appeals Sixth Circuit.

May 22, 1957.

Lester P. Schoene, Washington, D. C. (Grant Stetter, Washington, D. C., John Y. Brown, Lexington, Ky., on the brief), for appellants.

Henry J. Cook, U. S. Atty., Lexington, Ky. (B. Robert Stivers and Marvin D. Jones, Asst. U. S. Attys., Lexington, Ky., on the brief), for appellee.

Before SIMONS, Chief Judge, and ALLEN and McALLISTER, Circuit Judges.

ALLEN, Circuit Judge.

Each of the four appellants was found guilty and sentenced under an indictment in two counts which charged (Count 1) that, prior to March 21, 1955, and up to and including April 6, 1955, appellants conspired to violate Title 18 U.S.C. § 371, and the Federal Train Wreck Act, Title 18 U.S.C. § 1992, and also charged (Count 2) the substantive offense under the same statute.

The case arose in connection with a strike by the Railway Brotherhoods against The Louisville & Nashville Railroad, hereinafter called the L. & N. The strike lasted from March 14, 1955, to May 10, 1955. Each appellant was an employee of long standing with the railroad and each had gone out on strike.

During this period Jack Stanley was vice-chairman of the strike committee for the Cumberland Valley Division of the L. & N., Warren was a picket captain, and Meyers and Hubert Stanley were on picket duty.

The L. & N. operated certain coal trains across the Miracle Bridge from the Harlan coal district in Kentucky to Corbin, Kentucky. Over 90% of the coal was destined for interstate commerce. On the night of April 5th or the early morning of April 6th Miracle Bridge was burned, its underpinning being destroyed.

Four other defendants, Ben Gambrel, Cecil Abner, Eugene Young, and Jim Johnson, jointly charged with appellants with conspiracy and burning the bridge, all pleaded guilty to the indictment. Appellants herein pleaded not guilty, were found guilty and sentenced to five years in the penitentiary on each count, the sentences to run concurrently.

In certain parts of the area covered by the strike the union had no organized picketing. One of these places was at Puckett Creek, Kentucky. About a week after the strike started Meyers recommended to Jack Stanley that Ben Gambrel help in the picketing, saying that he (Meyers) could not cover the Puckett Creek area together with other districts. As a result, on or about March 21st, Gambrel was engaged to help picket with the understanding that the expense of picketing would be paid. On March 25, 1955, Jack Stanley and Hubert Stanley visited Gambrel in Blackmont, Kentucky. Gambrel testified that Jack Stanley said something had to be done to stop the trains. Gambrel complained that he had never been paid and was given $95.00 the next afternoon.

On April 4th Jack Stanley again visited Gambrel. Gambrel testifies that Stanley at that time asked Gambrel to burn a bridge and gave Gambrel $50.00. Stanley denies that anything was said about burning a bridge, but admits that he met Gambrel on this occasion.

Gambrel then asked defendant Jim Johnson to help burn the Miracle Bridge. Johnson refused, but recommended defendants Abner and Young, and drove Gambrel to Wallings Creek, Kentucky, where Abner and Young lived. Gambrel offered them $20.00 each to assist in burning the bridge. Johnson, Abner, and Young testified in substance that Gambrel told Abner and Young that Jack Stanley wanted the bridge burned and the trains stopped, that even if they were put in the river they must be stopped. At 11:00 P.M. April 5th Johnson drove Abner and Young to Miracle Bridge and waited with Gambrel some distance away. After an unsuccessful trial Abner and Young ignited the bridge and were then taken back to Wallings Creek, each one being paid $20.00.

April 6th Jack Stanley was in Louisville. He testified that he went to Louisville on April 5th to borrow money to

pay his personal debts, but he told a garage man on April 5th that "he wasn't working and he was worried about the way things was going and he was afraid something would turn up and, if it did, he didn't want to be here."

On April 6th Gambrel went to Middlesboro. Not finding Jack Stanley, Gambrel told Hubert Stanley he had come for money which Jack Stanley owed him. Hubert Stanley talked with the local railroad union officials and was given a union check for $100.00. Hubert in turn gave Gambrel five twenty-dollar bills.

On April 7th, Jim Johnson took Gambrel to Middlesboro to see Jack Stanley. Gambrel testified that in this conference Jack Stanley promised him $600.00, which he would get later. On this occasion Gambrel said that he had a boy burned and needed money to take care of him and that if he got no money the boy's mother would talk. The next day (April 8th) Johnson and Gambrel met Jack and Hubert Stanley and Warren at Clear Creek. At this time Gambrel stated that he had the boy who was burned in a hospital at Mariemont, Ohio. While appellants agreed that money was the subject of the conversation, all denied that they asked how the boy came to be burned. Later Stanley checked the hospital story and found that it was false.

Isom Meyers then told Jack Stanley that Gambrel lied and had Stanley meet Johnson, who said that no more money should be given Gambrel, but that it should be given to the boys in Wallings Creek. Young and Abner each testified that after this Jack Stanley gave them $50.00 apiece.

After the bridge was burned each of the appellants was interviewed by the FBI. Hubert Stanley denied that he knew Gambrel. Isom Meyers denied that he recommended the employment of Gambrel to help in the picketing. Hubert Stanley and Isom Meyers denied having any knowledge of the burning of the bridge until after it had been consummated. Hubert Stanley Meyers and

Warren denied that they were present at the conferences described above. However, at the trial all three in general admitted their presence at these meetings. Warren denied throughout that he visited Gambrel with Jack Stanley on April 4th, but Jack Stanley testified that he believed Warren was there. Substantial evidence supports the finding evidently made by the jury that the account given above is in general correct, although controverted as to details.

Appellants contend that the trial court should have directed a verdict in favor of Warren, Meyers, and Hubert Stanley on the ground that it is not shown that any one of them knew of the plan to burn a bridge prior to the burning thereof. It is well established that one who has no knowledge of the object of a conspiracy cannot be a conspirator, for the intent to participate is lacking. Direct Sales Company v. United States, 319 U.S. 703, 63 S.Ct. 1265, 87 L.Ed. 1674. Those who have no knowledge of a plan prior to its completion cannot be guilty of aiding or abetting in the carrying out of the plan. Knowledge on the part of those accused of the object of the conspiracy after the conspiracy is ended and the offense committed is not sufficient. Moreover, evidence of knowledge must be clear and not equivocal.

The testimony as to stopping the trains was given mainly by Ben Gambrel, who stated that about March 25th at a meeting with Jack Stanley, Hubert Stanley and Meyers, Jack Stanley said that "there was four or five trains running" and "there had to be something or other done [to] stop them trains" and talked "about the bridges." Gambrel also stated that a few nights later Jack Stanley at Jim Johnson's asked Gambrel to burn "the bridge." While Gambrel testified that he had never talked with Hubert Stanley about burning bridges, his exact answer was "Not personally. We would all be together if we did." The evidence showed that this testimony related to a meeting in front of Meyers's house at

which Jack Stanley, Hubert Stanley and Meyers were present.

Three of the appellants cooperated in raising money for Gambrel. Warren collected $95.00 for him, to which amount Warren and both Stanleys contributed. Meyers was told by Jack Stanley to drive Gambrel to the Wasiota bridge. Meyers did this and Warren drove to the bridge to give this money to Gambrel.

Jack Stanley made a voluntary written statement which he declared under oath at the trial was entirely correct. This statement is printed in the margin.[1]

1.

"Mulberry, Ind.
"Jan. 12, 1956

"I, Jack Stanley, make the following statements, freely and voluntarily, to Special Agents John Gudis, James E. Rinks and Frank F. Staab, whom I know to be representatives of the Federal Bureau of Investigation. No promises or threats have been made to me and I fully realize these statements may be used against me in a court of law. I know I have a right to an attorney before making these statements. No offer of reward or leniency has been made to me to cause me to make these statements.

"I am thirty-seven years of age and now live in Mulberry, Ind.

"About the time the strike started I was Vice President of the Strike Committee for the Brotherhood of Maintenance of Way Employees, Local No. 2606, at Middlesboro, Ky. The President of the Strike Committee was Carl Britton, of Middlesboro, Ky. The other members of the Strike Committee were O. S. Flenor, and I don't remember the names of the others.

"I first met Ben Gambrel at Blackmont, Ky., in the presence of Hubert Stanley, Tom A. Warren and Isom Meyers. This was near Meyer's house. We were talking about the men who were doing some repair work on the railroad. We decided that something should be done to stop the railroad workers as we were on strike. Isom Meyers introduced me to Ben Gambrel. Gambrel at this time decided he was going down there at Tejay, Ky. and stop the operations.

"The next time I saw Ben Gambrel he asked for money. We made up a sum of money at the Union Hall and some the members who were there each put in some money. I believe it amounted to $85. Tom Warren gave this money to Isom Meyers to give to Ben Gambrel, as well as I can remember. This was done before the Miracle Bridge was burned.

"A few days later Ben Gambrel told me in the presence of Tom Warren & my Bro. Hubert that he had chased some railroad men off the job at Tejay, Ky.

"About 2 weeks after this meeting with Ben Gambrel, I again saw him. He told me had been up to where the bridge had burned was Latonia, Ky. I remember reading about that in the paper. This was at Blackmont, Ky.

"Before the bridge burned I and the Smith Brothers, Land and Esco, went with me to find Ben Gambrel, at Blackmont, Ky. I and Tom Warren went up there to see Ben Gambrel on another night. We saw Ben Gambrel at Jim Johnson's house which is near Gambrel's house. On the one trip my brother Hubert was with Tom Warren and me.

"Ben Gambrel had told me he had some plans of his own to stop the train operations. He wanted $300 for the job. He said he had some men around here. I told him I might be able to get $300. I did not know what his, Gambrel's, plans were.

"I & the Smith Brothers came to Ben Gambrel on a Monday night just before the bridge at Miracle burned. At that time Gambrel told me his plans were in the making and would take place that night. The next day my wife and I went to Louisville—stayed overnight, & came back home on Wednesday. Thursday afternoon I learned that a bridge had been burned at Miracle, Ky.

"A few days later, right after the bridge had burned, Ben Gambrel came to the Union Hall and told my brother Hubert he had burned the bridge up there, that one of the boys had his shoe blown off and his leg burned bad. He said he had the boy in Virginia in a hospital. He said he had to have $100.00 to pay the bill and get the boy out of there.

"A short time later Gambrel sent a little boy to my house early one morning. The boy said Ben said he wanted to see me. I went to meet Ben Gambrel and he told me he had to have some money to take the burned boy out of Virginia to Washington, and then everything will be all right.

"I tried to borrow some money in Harlan, Ky. but had no luck. Then I went to the Railroad Brotherhood in Corbin and talked to a Mr. Sturgeon and told him about the burned boy and what Ben Gambrel had told me. Mr. Sturgeon told me that a proper form would have to be prepared and the injured boy would have to be examined by a Union doctor before the Union could do anything for the boy.

In it Jack Stanley said that Gambrel told him he "had some plans of his own to stop the train operations. He wanted $300.00 for the job." While Stanley said he did not know what Gambrel's plans were, he admitted going to Gambrel's home on the night of April 4th. Stanley testified that at this time Gambrel told Stanley his plans were in the making and would take place that night. Jack Stanley then drove to Louisville April 5th because he did not want to stay at home and have something "turn up."

*Immediately after the bridge was* burned Gambrel went to Middlesboro, told Hubert Stanley that Jack Stanley owed him money, and Hubert Stanley borrowed $100.00 to give Gambrel without inquiring, so he says, what the debt was for.

Appellants urge that Gambrel's testimony was completely discredited upon the ground that he was an accomplice, a perjurer, a blackmailer, and a self-confessed liar. They urge that the testimony of Gambrel that Jack Stanley said they had to do something to stop the trains is entitled to no credence and that it was in no way corroborated in the record. Gambrel's statements are important because, if true, they establish that prior to the burning of the bridge Jack Stanley believed that something drastic must be done to stop the running of the trains.

This record shows that Gambrel not only was an inconsistent and evasive witness, but by his own admission lied about the story of the boy being in the hospital and unquestionably used this story to extort money from appellants.

However, Gambrel was employed by Jack Stanley on the recommendation of Meyers at a conference at which Warren, Meyers, and Hubert Stanley were present.

The court properly cautioned the jury that the law recognizes that testimony given by accomplices is looked upon with suspicion, that the jury ought to "scrutinize it carefully" and "weigh it carefully" and "with great care." The court charged "You ought to weigh it in the light of any possible motives that might have induced them to testify falsely." To determine the truth or falsity of the testimony of an accomplice it should be weighed by the same rule as the testimony of other witnesses is weighed, that is, by considering the accomplice's connection with the crime and the defendant, his interest in the case, his appearance on the stand, the reasonableness of his testimony, and its consistency with other facts proved in the

He said he would have to see the injured boy and Ben Gambrel would have to sign some statement.

"Before this attempt to get money in Corbin, Ben Gambrel went to my brother, Hubert, & Ben Gibson at Middlesboro at which time they gave Ben Gambrel $100.

"Later on, and after the Corbin deal, I again met with Ben Gambrel. He had gone to my father, Will Stanley, and told him all about the boy being burned at the Miracle Bridge and claimed I owed him some money for the bridge burning. My father told me to meet Gambrel at Clear Creek and get the matter straightened out. I took Hubert and Tom Warren with me to meet Ben Gambrel at Clear Creek. My father also drove up there. That day Ben Gambrel said he had to have more money—that he had moved the boy to Cincinnati & would have to move him again that night. I told Ben Gambrel that I was going to see this boy—that I did not believe his story. I went to Cincinnati and found no trace of this boy in the hospital Ben Gambrel told me about.

"A day or two later I went to Loyall, Ky. and talked to Isom Meyers. I told him about what Ben Gambrel was doing. Isom Meyers told me he was going to bring a man to me who could tell me all about the persons who burned the bridge. Then Meyers brought Jim Johnson to me. Jim Johnson told me he and Ben Gambrel were sitting in a car the night the bridge burned. He said don't give Ben Gambrel any more money. I know the two boys who burned the bridge and they were not hurt while they burned it. This meeting took place near Sharp's Court near the Middlesboro Car Racing track."

In his own handwriting Jack Stanley wrote:

"I have read the above statement and to the best of my knowledge they are all true and correct."

(Signed) Jack D. Stanley.

case. Campbell v. People, 159 Ill. 9, 42 N.E. 123; Butt v. State, 81 Ark. 173, 98 S.W. 723; Sinclair v. Jackson, 47 Me. 102.

Gambrel's testimony was corroborated by that of Jack Stanley and also by the acts of the several appellants. The jury was entitled to consider the active cooperation of these appellants, their presence at conferences where their knowledge of the matters discussed was not only possible but probable, and their subsequent actions in planning to avoid detection, as to whether or not they aided in any way in the burning of the bridge.

The jury was also entitled to consider the falsity of the stories told by each of the appellants to the FBI. An attempt to fabricate evidence is to be considered as evidence of guilt as to the main facts charged. 20 Am.Jur. 271, Evidence, Section 289; Andrews v. United States, 5 Cir., 157 F.2d 723, certiorari denied 330 U.S. 821, 67 S.Ct. 771, 91 L.Ed. 1272; Banning v. United States, 6 Cir., 130 F.2d 330, certiorari denied 317 U.S. 695, 63 S.Ct. 434, 87 L.Ed. 556.

Circumstantial evidence may be sufficient corroboration of the testimony of an accomplice. A declaration of a codefendant, if admissible, may corroborate the testimony of an accomplice. Admissions which tend to connect the accused with the crime may constitute corroboration. State v. Chauvet, 111 Iowa 687, 83 N.W. 717, 51 L.R.A. 630. The statement of Jack Stanley heretofore given strongly supports Gambrel's story. The matters set out therein corroborated Gambrel's testimony that Jack Stanley planned and authorized the burning of the bridge.

Moreover, Jack Stanley's oral statements to Staab, special agent for the FBI, who interviewed Jack Stanley and took his written statement, not only corroborate the story of Gambrel with reference to Jack Stanley's guilt but also corroborate the evidence as to the complicity of the other appellants. In his written declaration Jack Stanley said nothing about the appellants' knowing of the plan to burn the bridge; but Staab testified that Jack Stanley made a number of statements to him which Stanley would not let be inserted in the written statement. One of these, Staab testified, was that "He [Jack Stanley] said that Tom Warren, Isom Meyers and his brother Hubert were in this thing as much as he was. * * *" The court charged the jury at the time that testimony was given to disregard the oral statement with reference to Warren, Meyers, or Hubert Stanley because it was not made in the presence of appellants and they could not be bound by it as they were not in position to controvert it. This was a correct ruling. See Kirby v. United States, 174 U.S. 47, 19 S.Ct. 574, 43 L.Ed. 890; in which a judgment of conviction was reversed because the accused was not confronted by witnesses. The right of confrontation gives the accused a chance to meet the witnesses face to face and the opportunity of cross-examination. Dowdell v. United States, 221 U.S. 325, 330, 31 S.Ct. 590, 55 L.Ed. 753; Snyder v. Massachusetts, 291 U.S. 97, 54 S.Ct. 330, 78 L.Ed. 674.

Jack Stanley under oath in the presence of appellants Warren, Meyers and Hubert Stanley repeated in substance the statement originally held inadmissible. This gave these appellants the right to cross-examine Jack Stanley because his testimony was incriminating to them and thus in fact he became a witness against them. 33 A.L.R. 826; State v. Crooker, 123 Me. 310, 122 A. 865, 33 A.L.R. 821. Staab had testified that Jack Stanley told him that the union headquarters wanted the trains stopped or the strike could be lost. Stanley denied this on direct examination, but when asked on cross-examination "Did you tell Mr. Staab that?" he answered, "I don't remember." Then he was asked "Now you told Mr. Staab that Isom Meyers, Tom Warren and Hubert Stanley were in this matter with you, didn't you?" Stanley's answer after certain objections was "They had been with me." Question: "And you told that to Mr. Staab?" Answer: "I think so." By

this testimony Jack Stanley corroborated the story of Gambrel with reference to his own knowledge before the act was done of the plan to burn the bridge. Also this testimony given in the presence of appellants, Warren, Meyers and Hubert Stanley, and subject to cross-examination, justified an inference of knowledge on the part of the other appellants of the plan before its consummation.

The trial court denied a motion to dismiss the indictment as to Jack Stanley for the alleged reason that it was based upon his own testimony before an earlier grand jury without advice as to his constitutional privilege against self incrimination. Appellants urge that this constituted reversible error. The testimony in question was given under subpoena by Jack Stanley in May, 1955, while he was neither in custody nor under arrest. The grand jury which heard the testimony did not indict him and the testimony consisted of a denial of facts which might have tended to incriminate him. In his motion for dismissal Stanley stated that he "believes" his testimony before the first grand jury was the basis upon which the grand jury of January, 1956, returned an indictment against him. No evidence is presented upon this point.

The contention that the court erred in not dismissing the indictment as to Jack Stanley is not sustained by the applicable law. The many cases cited in support of appellants' motion are in general not in point. A sharp distinction is made in the decisions between testimony given before a grand jury by a defendant in custody under a criminal charge and by a witness who is later charged with crime.

The protection afforded a defendant in custody is also extended to a witness who is virtually in the position of a defendant. Thus, in Commonwealth v. Kilgallen, 379 Pa. 315, 108 A.2d 780, relied on by appellants, the Attorney-General of Pennsylvania had petitioned for an investigatory grand jury to inquire into possible criminal activities of officials and employees of the city of Philadelphia. In the Attorney-General's petition, Kilgallen, President of the Council, was charged by name with bribery and other crimes. In its charge to the grand jury called in response to the petition, the court recited these charges, instructing the grand jury to examine into them and, if it found them true, to return indictments.

Kilgallen testified under protest before the investigatory grand jury, claiming his privilege against self incrimination, and his testimony was considered by the grand jury, which later indicted him. It was rightly held that the admission of Kilgallen's testimony under these circumstances was reversible error.

The situation presented herein is totally different. Jack Stanley was called under subpoena to testify as a witness. It is not shown nor claimed that he was charged with any crime at the time he testified. The response to the grand jury's subpoena does not constitute coercion. The grand jury is authorized to call witnesses in the course of its deliberations and citizens are required as a public duty to testify. Blair v. United States, 250 U.S. 273, 281, 39 S.Ct. 468, 63 L.Ed. 979. Moreover, if the witness is asked questions which tend to incriminate him, it is his duty to claim the privilege and to refuse to testify. Jack Stanley did not claim the privilege and none of his answers before the grand jury tended to incriminate him. In fact, he testified that he made the answers that he gave in the grand jury hearing because to answer otherwise would incriminate him.

An excellent discussion of this question is found in State v. Duncan, 78 Vt. 364, 63 A. 225, 4 L.R.A.,N.S., 1144, which held that a refusal to dismiss an indictment returned under circumstances quite similar to those herein did not constitute reversible error. To the same effect are State v. Comer, 157 Ind. 611, 62 N.E. 452; People v. Lauder, 82 Mich. 109, 46 N.W. 956; State v. Anderson, 10 Or. 448; United States v. Klein, D.C., 124

F.Supp. 476; United States v. Haas, D. C., 126 F.Supp. 817; 27 A.L.R. 157 and cases cited; 4 L.R.A.,N.S., 1144.

The fact that Jack Stanley's statement before the grand jury as given in this record did not incriminate him is an additional reason why the court's refusal to dismiss the indictment was correct. Siklek v. Commonwealth, 133 Va. 789, 112 S.E. 605, 27 A.L.R. 135.

In general the testimony of a witness before the grand jury, later indicted, is admissible on his trial. State v. Broughton, 29 N.C. 96; Jenkins v. State, 35 Fla. 737, 18 So. 182; Gardner v. State, Tex.Cr.App., 28 S.W. 470; 27 A.L.R. 151; Coplon v. State, 15 Ala.App. 331, 73 So. 225; State v. Taylor, 202 Mo. 1, 100 S.W. 41; Wade v. State, 15 Ohio Cir.Dec. 279.

Appellants contend that under Section 6 of the Norris-LaGuardia Act, 29 U.S.C. § 106, 29 U.S.C.A. § 106, the court should have instructed the jury that appellants could not be convicted except upon clear proof of actual participation in, authorization of, or ratification of, the illegal acts charged. While neither the union nor its officers were joined as defendants under the indictment, all appellants were members of a labor organization involved in a labor dispute which culminated in a strike, during which the Miracle Bridge was burned. The defendants who actually burned the bridge, pleaded guilty, and are not here appealing, were neither members of any of the railroad brotherhoods, nor of any union, nor agents of any union.

The statute was not called to the attention of the District Court and no request to charge, formal or informal, was based upon it. Appellant's urge that the court of its own motion should have charged under Section 6 with reference to the degree of proof required for conviction thereunder, and failure so to charge was so obviously prejudicial that it requires reversal. The court's charge, so far as it defines conspiracy and the prerequisites of violation of the conspiracy statute, is not questioned. Since the sentence on the two counts was concurrent, if the sentence under either count is valid, under the well-established rule the judgment and sentence must be affirmed.

Whether the court was required, if so requested, in the circumstances of this case to charge under Section 6 we need not here decide. It is only in exceptional cases that questions of law not presented to or passed upon by the trial court will be reviewed in this court. Helvering v. Hormel, 8 Cir., 111 F.2d 1, affirmed 312 U.S. 552, 61 S.Ct. 719, 85 L.Ed. 1037; Duignan v. United States, 274 U.S. 195, 200, 47 S.Ct. 566, 71 L.Ed. 996; Trapp v. Metropolitan Life Insurance Company, 8 Cir., 70 F.2d 976, 981. As the Supreme Court stated in Hormel v. Helvering, supra, this rule should be adhered to except "where the obvious result would be a plain miscarriage of justice." [312 U.S. 552, 61 S.Ct. 722.]

Here the court charged fully upon the offenses covered by the indictment and in these particulars no objection was made. Appellants neither asked for instructions covering Section 6 of the Norris-LaGuardia Act nor took exception to the failure to charge upon that point. All appellants were allowed their full day in court. In Sisco v. McNutt, 8 Cir., 209 F.2d 550, 553, announced January 29, 1954, which involved an action against a labor union officer, it was held that failure to charge Section 6, in absence of request, did not produce a plain miscarriage of justice. Here the court charged correctly that all who aid and abet in the commission of a crime are principals, 18 U.S.C. § 1992. The jury, evidently applying this statute, found that appellants wilfully caused the railroad bridge to be set on fire. The court repeatedly stressed the requirement of a finding of guilt beyond a reasonable doubt and we conclude that a plain miscarriage of justice did not occur, requiring reversal because of failure to charge under Section 6.

The court's instructions that the jury should determine if the burning of the

bridge was with intent to "derail, disable, or wreck a train" are also attacked. No specific charge was requested on this point and no objection was made to the instruction given. This also is a question that should not be raised for the first time on appeal. Federal Rules of Criminal Procedure rule 30, 18 U.S.C.; Jackson v. United States, 6 Cir., 179 F.2d 842, certiorari denied 339 U.S. 981, 70 S.Ct. 1031, 94 L.Ed. 1385. The objection is overruled.

■ We question the contention that the statute requires proof of an intent to wreck the train or otherwise render inoperative the engine, motor unit, or car itself, rather than facilities which are essential to the operation and safety of the train. The statute specifically requires, paragraph 2, that whoever "willfully sets fire to * * * any * * * structure, property, or appurtenance used in the operation of any such railroad * * * or otherwise makes any such * * * bridge, * * * structure, property, or appurtenance unworkable or unusable or hazardous to work or use, with the intent to derail, disable, or wreck a train * * * operated * * * in interstate or foreign commerce" is guilty of a violation of the statute. Here a structure used in the operation of a railroad was set on fire. The bridge was rendered unworkable, unusable, and hazardous. A train actually operating across the Miracle Bridge could not complete its run across the bridge for a number of hours after the fire. Warren, who had been a railroad bridge and repair worker for 30 years, testified that if a train ran on that bridge before its repair it would be wrecked, that the bridge would not hold up a train. On this point the charge was clearly correct.

The further contention that appellants could not have intended to derail, disable, or wreck a train, is tenuous in the extreme. This contention is based upon the fact that upon certain occasions motor cars operated on the railroad ahead of trains were used during this period to make certain that the switches and bridges had not been damaged. Appellants urge that they were aware of the fact that a train could not have been derailed or wrecked at Miracle Bridge when such precautions were taken and that the necessary proof of intent was lacking. However, it was not shown that such motor cars were sent ahead of every train and much of the proof on this point was not addressed to trains crossing Miracle Bridge. The chief positive testimony in favor of appellants on this point was that only on some six or eight occasions during this period of several weeks were such motor cars seen at Miracle Bridge. The chief dispatcher of the railroad testified that these motor cars were not sent out regularly and that it would have been impossible to have had a motor car in front of every train that went over the track during the period.

■ The statements by the court upon the evidence do not require reversal. The court reiterated to the jury that they were the sole judges of the facts and not bound by the comments of the court. Since Jack Stanley testified that his signed statement told the truth, and his statement was read in the presence of the other appellants, it was not error for the court to quote therefrom. The trial judge had a right to express his opinion to the jury since he gave them clearly to understand that the jurors were not bound by the judge's opinion, but were free to exercise their own judgment. Tuckerman v. United States, 6 Cir., 291 F. 958, 964; United States v. Rosenberg, 2 Cir., 195 F.2d 583, certiorari denied 344 U.S. 838, 73 S.Ct. 20, 97 L.Ed. 687; Lott v. United States of America, 5 Cir., 230 F.2d 915, 918.

The trial was fair, and no reversible error is shown. The judgment of the District Court is affirmed.