UNITED STATES of America,
Plaintiff-Appellee,

v.

Bige HENSLEY, Herbert Costello Stacy,
Clayton Turner and Charles Engle,
Defendants-Appellants.

No. 16455.

United States Court of Appeals
Sixth Circuit.

Feb. 23, 1967.

Leonard B. Boudin, New York City, I. Philip Sipser, Paul O'Dwyer, New York City, Dan Jack Combs, Pikeville, Ky., on brief; Henry Winestine, New York City, of counsel, for appellants.

Moss Noble, Asst. U. S. Atty., Lexington, Ky., George I. Cline, U. S. Atty., Lexington, Ky., on brief, for appellee.

Before EDWARDS and CELEBREZZE, Circuit Judges, and CECIL, Senior Circuit Judge.

EDWARDS, Circuit Judge.

Four appellants seek reversal of their convictions after jury trial in the Eastern District of Kentucky. The two-count indictments charge both a conspiracy to violate the Federal Train Wreck Act, Title 18 U.S.C. § 1992 (1964), and the substantive offense of violating it.

The cases arise out of the now generation old warfare which has raged intermittently in the Harlan-Hazard area of Perry County, Kentucky, between the United Mine Workers and its adherents and nonunion mine operators. These four defendants (and four others who were not convicted) were charged specifically with conspiring to place and placing a massive charge of nitroglycerin on the tracks above the center pier of a railroad bridge known as Daisy Bridge No. 4. This bridge is located in a remote area called Glomawr Hollow where the Louisville and Nashville Railroad tracks cross Leatherwood Creek enroute to a mine known as Leatherwood Mine No. 2. At the time this mine was nonunion.

This record—a transcript of over 3,000 pages, since on motion based on affidavits of poverty defendants were allowed to appeal without printing an appendix—reads a good deal more like the story of an incident in a guerrilla war than the normal appellate record before this court.

The appeals present every issue which capable lawyers can now devise concerning criminal trials where convictions were based (at least in important degree) upon defendants' own confessions.

Each of these four defendants confessed. The confessions were in writing, preceded by the then standard FBI warnings and signed by defendants. The District Judge conducted extensive hearings on the claim of involuntariness of these confessions. He took testimony before the trial and at the trial (with the jury absent). He made independent adverse

findings of fact as to appellants' claims of improper inducement and psychological coercion. Subsequently, he submitted the issue of voluntariness of the confessions in his charge to the jury. After receipt of "guilty" verdicts, he resubmitted the question of voluntariness as a special question in each case.

Three defendants (Hensley, Turner and Stacy) testified at the independent proceedings before the judge. The District Judge's finding of facts at the conclusion of the first of these independent proceedings (which we find amply supported by this record) will serve to state the basic facts against which we are asked to review many legal issues:

"This prosecution grows out of a situation of labor-management strife in 1963 in the coalfields region of Eastern Kentucky. There were two or more groups of 'roving pickets' active in the area, and law enforcement officers had the defendant Berman Gibson and his 1953 Ford automobile under surveillance in this connection. Several bridges of the Louisville and Nashville Railroad Company, along tracks which served these coalfields, had been destroyed or damaged by the vandalistic use of high explosives in the six months period preceding June 11, 1963.

"On that date John Mitchell Smith, an inspector, and Cleon Begley, a sergeant, of the L. and N. police, were patroling their employer's tracks in an isolated area south of Hazard, in Perry County, Kentucky, in a motorcar being driven by Sgt. Begley. They stopped on a hill overlooking a railroad bridge at Daisy, Kentucky, about 1:45 or 2:00 a. m. in the course of their patroling activities. As their vehicle stopped, Inspector Smith flashed the vehicle's spotlight on the bridge, and the officers saw two men standing near a three-foot stack of materials (afterward ascertained to be high explosives) just above the center pillar of the bridge. The officers alighted from the vehicle quickly, and Sgt. Beg-ley fired a dozen or more shots from a 30-caliber carbine in the direction of the trespassers, who fled off the north end of the bridge into bushes. The officers thereupon re-entered their automobile and drove rapidly in the same direction to a road leading off of Kentucky state highway route 699 around the north end of the Daisy bridge. There, parked just off the roadway, the officers saw the defendant Gibson's automobile, in which an unidentified occupant was seated under the steering wheel. The officers drew their weapons and ordered the occupant out of the Gibson vehicle and into their own. The defendant Bige Hensley emerged without further action and was placed in the back seat of the car Sgt. Begley had been driving. Although it appears from the evidence that the defendant Mr. Hensley may not ever have been formally arrested, from that time of the officers' interruption, Mr. Hensley's liberty of movement was restricted by these and other officers and, for purposes of this action, his arrest was complete. Henry v. United States (1959), 361 U.S. 98, 103, 80 S.Ct. 168, 4 L.Ed.2d 134.

"The officers then investigated further. On the front seat of the Gibson automobile, they found and seized a .25-caliber automatic pistol and in the back seat[1] a roll of blasting fuse. They asked their prisoner to identify the materials on the bridge, and Mr. Hensley replied that he did not know; otherwise, the railroad policemen did not interrogate the prisoner. Suspecting the material to be high explosives, the officers undertook to (1) prevent its detonation, (2) preserve this evidence of crime and (3) apprehend the other trespasser or trespassers they had previously seen on railroad property. While Mr. Hensley was in custody in the automobile, Sgt. Begley heard noises in a nearby wooded section, called for anyone therein to identify themselves, and receiving no response, fired additional shots in the

direction of the noises heard. Further investigation by the officers revealed that the material they had previously seen on the railroad bridge was large quantities of both liquified and solidified nitroglycerin with blasting fuses and caps attached and 'ready to go.'

"With the defendant Mr. Hensley still in custody, the officers then drove their motorcar to the nearest railroad telephone at Dent, Kentucky, to summon help.[2] Trooper Homer Howard, of the Kentucky State Police, arrived on the scene at about 3:00 o'clock a. m. He placed handcuffs on Mr. Hensley in order that one or more of the officers guarding Mr. Hensely might participate in a search of the surrounding area. Two additional Kentucky troopers arrived half an hour later, and about 4:30 a. m., Andrew L. Carnegie, a special agent of the Federal Bureau of Investigation, Department of Justice, arrived. None of these officers interrogated the defendant Mr. Hensley, except that the FBI agent obtained information concerning his identification and inquired what Mr. Hensley was doing at that place at that hour.[3] FBI agent Swearingen arrived at the scene about 7:15 o'clock a. m., and a number of additional officers also came upon the scene to assist with the investigation. The general investigation continued throughout the remainder of the day, and one or more of the defendants were discovered afterward in the general region of Daisy. The nearest committing magistrate of the Commonwealth of Kentucky resided at Leatherwood, about six miles from the L. and N. bridge at Daisy, and the nearest United States commissioner was located about 70 miles distant at Jackson, Kentucky.

"After the explosives on the bridge had been removed by experts called to the scene for that purpose, the two FBI agents transported the defendant Mr. Hensley the 22 miles to the Kentucky State Police barracks at Hazard where Mr. Hensley was photographed and fingerprinted. He was then taken before the United States Commissioner at Jackson where he was arraigned about 1:00 o'clock, p. m. This defendant was then incarcerated in lieu of bail bond in the federally-approved jail in Lexington, Kentucky.

"Special FBI agent John F. McCauley interviewed the defendant Mr. Hensley in the Fayette County jail at Lexington for about two hours on June 13, 1963, and for about one hour on June 20, 1963. The defendant Mr. Hensley had advised Agent McCauley that he had no counsel and did not intend to employ a lawyer.[4] Mr. McCauley considered his interrogation of the defendant Mr. Hensley complete on the latter date; however, in response to a message relayed to him from Mr. Hensley, the agent returned to the jail on the following day, and Mr. Hensley signed a written confession.

"On June 20, 1963, the defendant Messrs. Britt Baker, Adam Huff, Berman Gibson, Charles Engle, Herbert Stacy and Tommy Allen Combs appeared separately before Hon. Kash C. Williams, United States Commissioner, at Jackson, Kentucky. Messrs. Huff, Engle and Stacy waived preliminary examination, and Messrs. Baker, Gibson and Combs requested examinations."

---

FOOTNOTES IN ORIGINAL:

"1. Inspector Smith was not certain where the roll of blasting fuse came from, but he testified it came out of the Gibson vehicle.

"2. The L. and N. facility at Dent, Kentucky, is about two or three miles from the bridge at Daisy, Kentucky.

"3. The defendant Mr. Hensley answered all such inquiries with the response that he had parked the Gibson car where it was discovered and had gone to sleep.

"4. Dan Jack Combs, Esq., of defense counsel, testified that Mrs. Berman Gibson employed him to represent all these defendants prior to June 21, 1963; but he was unable to say whether the defendant Hensley knew of such employment prior to June 21, 1963."

Appellants claim generally in their stated questions 1, 7 and 8 that a new trial should be granted because of the admission of their confessions and other evidence procured in violation of their rights under the Fourth, Fifth and Sixth Amendments.

Somewhat more specifically, at argument of this case the most important issue developed was that these confessions were elicited by in-custody interrogation without the presence of legal counsel. The record contains credible testimony that each defendant was warned of his constitutional rights in traditional language, but it is clear that they were not specifically told that they were entitled to have a lawyer present at interrogation or that if they couldn't pay for one, a lawyer would be publicly supplied and interrogation would be stopped until he was present. Cf. Miranda v. State of Arizona, 384 U.S. 436, 474, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

The trial of these cases began July 13, 1964. This date was approximately three weeks after the United States Supreme Court decision in Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964). Escobedo was argued to this court (at least generally) as pointing toward a holding that in-custody interrogation in the absence of counsel was inherently coercive. This, of course, was the specific holding of the even more recent landmark decision of the United States Supreme Court in Miranda v. State of Arizona, supra. The Supreme Court's view of the coercive nature of in-custody interrogation led it in Miranda to bar confessions thus produced unless there had been an added warning (of right to counsel at interrogation and at public expense if need be), Miranda v. State of Arizona, supra, 384 U.S. at 473, 86 S.Ct. 1602, and a clear affirmative waiver of such right. Miranda v. State of Arizona, supra, 384 U.S. at 475, 86 S.Ct. 1602.

This court had held decision in these appeals until the Miranda cases and their sequels were decided. Johnson v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966); Davis v. State of North Carolina, 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966). The United States Supreme Court held in the Johnson cases that the Miranda decision was not retroactive and would apply only to cases in which the trial began after June 13, 1966. It also held that the Escobedo decision was not retroactive and would apply only to cases in which trial began after June 22, 1964.

It thus seems clear to this court that appellants' most substantial argument for appellate relief was defeated by the decision of the Supreme Court in Johnson v. State of New Jersey, supra, not to make the Miranda rule effective retroactively.

Nonetheless, it is clear that appellants are entitled to scrutiny by this court of their claims that their confessions were involuntary under the standards set forth in Escobedo and even more careful scrutiny as to the standards even more recently laid down in Davis v. State of North Carolina, supra.

In Escobedo the basic holding was:

"We hold, therefore, that where, as here, the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting incriminating statements, the suspect has requested and been denied an opportunity to consult with his lawyer, and the police have not effectively warned him of his absolute constitutional right to remain silent, the accused has been denied 'the Assistance of Counsel' in violation of the Sixth Amendment to the Constitution as 'made obligatory upon the States by the Fourteenth Amendment,' Gideon v. Wainwright, 372 U.S. [335,] at 342, [83 S.Ct. 792, 9 L.Ed.2d 799] and that no statement elicited by the police during the interrogation may be used against him at a criminal trial. * * *" Escobedo v. State of Illinois, supra, 378 U.S. at 490–491, 84 S.Ct. at 1765.

The factual distinctions between the instant cases and *Escobedo* are too many and too marked for it to be authority for reversal.

■ As we have noted, the confessions we deal with here were signed after in-custody interrogation without presence of counsel. This likewise was true in *Escobedo*. Unlike the circumstances surrounding the *Escobedo* confession, however, there is credible evidence that these confessions were preceded by preliminary hearings before the constitutional warnings by a U. S. Commissioner, and by the then required constitutional warnings by the FBI agents who interrogated. There was no contention that retained counsel was present and demanding access to his client. Nor does the record establish that the defendants asked for and were denied counsel at the interrogation wherein the confessions were signed.

In *Davis* the Supreme Court, recognizing the non-retroactivity principle of Johnson v. State of New Jersey held:

"The review of voluntariness in cases in which the trial was held prior to our decisions in *Escobedo* and *Miranda* is not limited in any manner by these decisions. On the contrary, the fact that a defendant was not advised of his right to remain silent or of his right respecting counsel at the outset of interrogation, as is now required by *Miranda,* is a significant factor in considering the voluntariness of statements later made. This factor has been recognized in several of our prior decisions dealing with standards of voluntariness. Haynes v. [State of] Washington, 373 U.S. 503, 510–511, [83 S.Ct. 1336, 1341–1342, 10 L.Ed.2d 513] (1963); Culombe v. Connecticut, 367 U.S. 568, 610, [81 S.Ct. 1860, 1883, 6 L.Ed.2d 1037] (1961); Turner v. [Com. of] Pennsylvania, 338 U.S. 62, 64, [69 S.Ct. 1352, 93 L.Ed. 1810] (1949). See also Gallegos v. State of Colorado, 370 U.S. 49, 54, 55, [82 S.Ct.

1209, 8 L.Ed.2d 325] (1962)." Davis v. State of North Carolina, supra at 740–741, 86 S.Ct. at 1764.

While clearly the mentioned warnings were given in the present cases, we read this as requiring review of all factors which had been cited as contributing to involuntariness of confessions in all cases prior to *Miranda* and *Escobedo*. This review we now undertake.

Certain facts important to our consideration of these confessions should be noted first. They serve to distinguish these appeals from the facts of important cases upon which appellants strongly rely.

None of these confessions [1] was made during a period of custody preceding presentation of one of the appellants before a United States Commissioner. Cf. Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957); McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943). Each of the confessions was preceded by a Commissioner's hearing wherein evidence (albeit disputed) indicates that the appellant in question was advised of his right to counsel and his right to a preliminary hearing. Cf. Mallory v. United States, supra; McNabb v. United States, supra; Escobedo v. State of Illinois, supra; Davis v. State of North Carolina, supra.

This record contains credible testimony which judge and jury accepted that each of the confessions was signed after a repetition of these same warnings by the interrogating officer.

The FBI agents who interrogated these four defendants and witnessed their confessions testified to giving the standard warnings of right to silence, right to counsel, and that anything they said could be used against them. Each confession also contains an affirmation as to these same warnings by the appellant himself. Cf. Escobedo v. State of Illinois, supra; Davis v. State of North

---

1. Defendant Stacy gave an incriminating statement which was obviously intended as exculpation on June 17, 1963, shortly after his arrest on complaint and warrant and prior to hearing. This statement is dealt with below.

Carolina, supra; Mallory v. United States, supra; McNabb v. United States, supra; Massiah v. United States, 377 U.S. 201, (1964).

There is no claim of physical abuse or threat of same at any period of interrogation where these confessions were signed.[2] Cf. Davis v. State of North Carolina, supra.

Aside from the fact of in-custody interrogation to which we have previously referred, there are in this record no *undisputed* facts from which coercion or inducement of involuntary confessions may be inferred. Each allegation of coercion and inducement was met with positive and detailed contrary testimony by prosecution witnesses. At various points the prosecution produced testimony independent of FBI agents buttressing these denials. Such contrary testimony was first produced before the District Judge in the absence of the jury and later likewise produced at trial. Cf. Spano v. People of State of New York, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959); Haynes v. State of Washington, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963); Culombe v. Connecticut, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961); Turner v. Com. of Pennsylvania, 338 U.S. 62, 69 S.Ct. 1352, 93 L.Ed. 1810 (1949); Gallegos v State of Colorado, 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962).

None of these confessions was derived from interrogation following indictment. Cf. Massiah v. United States, supra.

The District Judge followed the procedure of making a prior independent determination of the voluntariness of these confessions[3] before submission of these cases to the jury. He charged the jury that they could not consider the confessions unless they found the confessions to be voluntary. Cf. Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).

The most detailed claims of constitutional deprivation contained in this record apply to defendants Hensley and Turner.

As to Hensley, it is asserted that he was arrested illegally, that his car was searched illegally and evidence from that search was introduced at trial, that he was not produced before a U. S. Commissioner without unreasonable delay, that he did not knowingly waive a preliminary hearing, and that, being illiterate, he was tricked into signing a document which he believed to be a release but which turned out to be a confession.

■■ Like the trial judge, we believe that Hensley most assuredly was "arrested" when he was seized and held at gunpoint by the two L. and N. detectives. An arrest to be effective does not require formal words of arrest or stationhouse booking. Henry v. United States, 361 U.S. 98, 103, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959); United States v. Baxter, 361 F.2d 116, 118 (C.A.6, 1966). He certainly was "deprived of his freedom of action in * * * [a most] significant way. * * *" Miranda v. State of Arizona, supra 384 U.S. at 444, 86 S.Ct. at 1612.

■ Just as definitely, however, we believe that Hensley's arrest was not ille-

---

2. The only physical threats asserted to have been made to any of these four appellants were alleged to have happened at the scene of the arrests of defendants Hensley and Stacy.

3. In his order denying new trial, the District Judge said:

"[T]he Court instructed the jury, as to each defendant's confession, to determine, first, the issue of the voluntariness of such confession, and if same was found to have been voluntary to consider the confession in determining the guilt or innocence of each defendant, but to disregard such confession if the same was found to have been involuntary.*

" * This was after each defendant had been accorded a fair hearing in the absence of the jury by the Court and a reliable determination on the issue of the voluntariness of each confession and on the underlying factual issues. The jury had no knowledge of such confessions until after such hearing and judicial determination that each was voluntary."

gal. Without scrutinizing the L. and N. police claims of peace officer credentials (see K.R.S. 277.280), they had common-law powers (reinforced by a Kentucky statute, K.R.S. 431.005) to make a citizen arrest in the instance of a felony being committed in their presence where there was probable cause to believe the person arrested was participating in committing it. These L. and N. detectives were patrolling this bridge because of prior instances of bombing. They saw the very offense [4] which they were hired to prevent in process of being perpetrated. They knew the background and motives of similar episodes. They noted the direction taken by the two men who were near the pile of nitroglycerin on the bridge. They were familiar with the roads in the remote territory [5] in which Daisy Bridge No. 4 was located and drove immediately to the point where they believed a get-away car would be located. There they saw a car which they recognized as one belonging to Berman Gibson, the leader of the pickets. Defendant Hensley was seated in the car—alone—with the parking lights on. When they arrested him and searched the car, they found a loaded pistol on the seat beside him and a dynamite fuse in the back of the car.

■ We believe that there was probable cause for these two L. and N. policemen to believe that a crime was being committed and that Hensley was a participant in it. Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L. Ed.2d 327 (1959). The search of the Gibson automobile was incidental to the arrest and justified by the need to search for weapons and for the means by which the crime was being committed. Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); Agnello v. United States, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145 (1925).

■ As to the claim of illegal delay in bringing Hensley before a magistrate,

we have a far different picture than in *Mallory*. The two L. and N. policemen who arrested Hensley had some pressing problems. They were alone in Glomawr Hollow; there was a 3-foot high pile of nitroglycerin on a bridge they were paid to protect; there was a train due to travel over that bridge that night; they were interested in finding and arresting the two men whom they had seen on that bridge. When Kentucky State Police and FBI agents began to arrive at the scene, their first preoccupations were with the problem of removal of the explosive and the search for those who had placed it.

FBI agents who took charge of Hensley had the added problem that no U. S. Commissioner was available in the immediate vicinity of Glomawr Hollow. They took Hensley to Hazard and then to Jackson, Kentucky, where he appeared before U. S. Commissioner Williams at 3:00 to 4:00 p. m. on the day of his arrest.

Although there was some questioning at the scene and en route in which Hensley denied any knowledge of or participation in the crime, there is no indication of intensive interrogation or that any delay was caused by interrogation. Further, as we have noted, no confession which was subsequently admitted was derived from any questioning on the day of arrest.

In many ways this case illustrates the wisdom of phrasing the rules of the criminal law in the generalized language employed in Rule 5(a) Fed.R.Crim.P. What may well be "unreasonable delay" under the circumstances of availability of police personnel and magistrates in the nation's capital, see Mallory v. United States, supra, may be an entirely different matter in Glomawr Hollow, Kentucky.

■ Hensley's waiver of preliminary examination is shown on the record of the hearing before the U. S. Commissioner and was the subject of specific oral

---

4. See Appendix, Trial Exhibit 3.

5. See Appendix, Trial Exhibit 2.

testimony by law enforcement officials who were present. Hensley's testimony does not deny the waiver. It does deny that he understood what he was doing. But on cross-examination Hensley admitted that previously he had been employed for two and one-half years as a deputy sheriff. We think the judge and jury could properly have viewed his waiver of preliminary hearing as being made knowingly and voluntarily.

■ Hensley also claimed that he was tricked into signing his confession by being told that it was a release to the FBI to search his car. His claim was that he signed and initialed five blank pages. The record contains evidence which shows why this claim did not persuade either judge or jury. Over and above the positive contrary testimony of the FBI agents, Hensley admitted on cross-examination that he not only signed a statement and initialed each one of the five pages, but he likewise initialed three separate places on the five pages where corrections were written in. We have examined the original exhibit and are no more persuaded than the judge and jury were.

■ The basic claim as to coercion or involuntariness in relation to Clayton Turner's confession appears to be that he was subjected to intensive and exhausting interrogation which deprived him of free will. Turner testified that he was interrogated by an FBI agent from 11 o'clock in the morning on June 14, 1963, to 9 o'clock in the evening without cessation and without food.

FBI agent Carnegie testified that he started interviewing Turner at 3:30 p. m. on June 14; stopped for dinner at 6:00 p. m. and resumed questioning briefly thereafter.

The judge and the jury had a right to believe the testimony of the government witness.

Defendant Stacy was arrested on complaint and warrant on June 17, 1963, at approximately 3 p. m. He was taken before a magistrate at 10 p. m. the same evening. The magistrate had been summoned to come to Hazard from Pikeville, Kentucky—a distance of approximately 60 miles.

■ The judge and jury could have concluded that the statement taken from Stacy immediately following his arrest was voluntary. There is no indication of delay of the hearing in order to interrogate. Although the statement was incriminatory, it was obviously given to attempt exculpation. We do not find facts establishing that there was any unreasonable delay (Rule 5(a) Fed. R.Crim.P.) or that the statement should have been barred. Cf. Mallory v. United States, supra.

Defendants Turner and Stacy also testified to a variety of inducements, threats or representations. These were specifically and emphatically denied and the judge and jury had a right to accept the denials.

It was, of course, partly to prevent the necessity of resolving just such conflicts of fact on the basis of one officer's or one defendant's testimony that the *Miranda* rules were laid down. As we have noted, however, *Miranda's* nonretroactivity defeats appellants' reliance on this doctrine.

■ Defendant Engle did not testify either at the preliminary hearings before the judge or at trial. There is testimony concerning his confession that two days after arrest he sent word to FBI agents that he desired to talk, and thereupon gave and signed a statement. This statement contained a recital that he had been advised of his rights, including the right to call a lawyer, "but I do not feel I need one." Following his confession Engle showed FBI agents where certain items concerned with the attempt to dynamite the bridge had been left on the scene. We do not ignore the fact that Engle was plainly illiterate. But, of course, this does not of and by itself make an otherwise voluntary confession involuntary.

■ Two other appellate issues of substance may be winnowed out from appellants' general claims. The first of

these claims is that the government agents who interrogated appellants did so after they had retained counsel and without notice to or agreement of said counsel. In this regard appellants rely upon Massiah v. United States, supra; Ricks v. United States, 118 U.S.App.D.C. 216, 334 F.2d 964 (C.A.D.C.1964); Queen v. United States, 118 U.S.App. D.C. 262, 335 F.2d 297 (C.A.D.C.1964). We have already noted that appellants herein had not been indicted as of the time of their confessions, whereas *Massiah* had been. In *Ricks* and *Queen*, the Appellate Court for the District of Columbia (on considerably different facts than those in the instant appeals) and with distinctive federal law applicable to the District of Columbia (see 2–2202 D.C.Code) held in effect that the fact that Massiah had been indicted and had retained counsel did not constitute substantial factual distinctions between the facts relevant to Massiah's statement and those of Queen and Ricks wherein neither of these things were true. These opinions we read as educated anticipation of the rules laid down subsequently by the Supreme Court in Miranda v. State of Arizona, supra. But we also feel that the Supreme Court's refusal to make the *Miranda* rule retroactive indicates that it clearly did not in *Massiah* contemplate a barring of all in-custody confessions without counsel present or agreeing to interrogation.

We hold that Massiah v. United States, supra, is distinguishable from our instant appeals on important factual differences. Further, on the authority of Davis v. State of North Carolina, supra, we decline to follow the suggested import of Queen and Ricks until after the date of the *Miranda* decision (June 13, 1966).

Just as important to our decision is the fact that the record allowed the judge and jury to find from disputed facts as to each appellant either that 1) he had not retained counsel, or 2) that he freely and voluntarily waived the presence of counsel at interrogation.

The second substantial legal issue advanced by appellants is that all of the defendants suffered prejudice by the admission of these four confessions before the jury in a joint trial when each confession referred specifically to guilty acts of the other defendants.

In this regard they rely upon Mora v. United States, 190 F.2d 749 (C.A.5, 1951), and United States v. Jacangelo, 281 F.2d 574, (C.A.3, 1960). We have also considered similar holdings in United States v. Bozza, 365 F.2d 206 (C.A. 2, 1966), and People v. Aranda, 63 Cal. 2d 518, 47 Cal.Reptr. 353, 407 P.2d 265 (1965).

Appellants' brief says on this issue: "[S]eparate trials were requested and also request was made that names of co-defendants be deleted from the confessions." Appellants do not furnish any record references for these statements. The appellee's brief flatly denies these two assertions. We have been unable to find any support in the record for either. It is clear that appellants did move for separation of the conspiracy and the substantive counts into separate trials. But we find no motion requesting separate trials for each of the individual defendants on each such count (a total of 16 trials). We find no motion to delete names from the confessions and no objection to the form of admonition given by the District Judge.

These facts, however, are not the only reasons for our declining to reverse these convictions on this ground. Here the District Judge admonished the jury that each confession was to be considered only as to the person who gave the statement. The admonition immediately preceded each confession. It was clear and definite. And there is certainly reason to believe from this record that the jury followed the admonition. Two of the joint defendants who were specifically named in the confessions were acquitted. One who was similarly named was the subject of a hung jury mistrial. None who did not themselves confess were convicted.

At the time this case was tried (and now) Rule 8, Fed.R.Crim.P., provided,

under appropriate conditions, for joinder of both offenses and of defendants. Rule 14, Fed.R.Crim.P.[6] also provided at the time of this trial for relief from prejudicial joinder:

"If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires. * * * " Rule 14, Fed.R.Crim.P.

These two rules squarely sanction joint trials of closely related offenses and of defendants charged with participating in the same act or acts. And Rule 14 provides a mechanism for severance on a showing of prejudice.

■ This circuit has to date clearly sanctioned both joint trials of conspiracy and substantive counts, and joint trials of multiple defendants. United States v. Andrews, 347 F.2d 207 (C.A.6, 1965), cert. denied, 382 U.S. 956, 86 S.Ct. 431, 15 L.Ed.2d 360 (1965); Stanley v. United States, 245 F.2d 427, (C.A.6, 1957). So likewise has the United States Supreme Court. Delli Paoli v. United States, 352 U.S. 232, 77 S.Ct. 294, 1 L.Ed.2d 278 (1957); see also Opper v. United States, 348 U.S. 84, 75 S.Ct. 158, 99 L.Ed. 101 (1954).

■ Where there was no motion for separate individual trials, we cannot find that the District Judge abused his discretion in failing to order same *sua sponte*. Nor do we find error in his refusing defendants' motion to separate the conspiracy and the substantive counts for separate trials when both referred to the same identical acts.

The balance of the issues we feel may be dealt with more summarily.

The attention of the court was excited to appellants' claims of abuses of their rights at a hearing before Commissioner Page on June 28. The physical barring of the lawyers from defendants whom they thought they were representing and the refusal of the Commissioner on request of counsel to give another warning to the two defendants who testified at that hearing of their Fifth Amendment rights represents a closer approach to frontier justice than constitutional procedure.

■ However, a careful reading of this transcript shows that the testimony which was received was not received against any of these defendants. It is also clear that no statements made at that hearing were ever offered or admitted at trial. It is also clear that the two defendants who testified there had previously signed the full confessions which were subsequently used. We cannot see that prejudice resulted to these appellants in the events just referred to or that they can appropriately be the basis for an order of new trial.

■ Appellants claim constitutional infringement by the fact that no record was made of grand jury minutes and hence the testimony was not available to them. They are able to cite no law in support of this contention. We agree with the Second Circuit that having a stenographer present to transcribe the testimony given before the grand jury would be better procedure, but that such a transcript is not a constitutional requirement. United States v. Cianchetti, 315 F.2d 584 (C.A.2, 1963). We also read Lawn v. United States, 355 U.S. 339, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958), and Costello v. United States, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1955), generally to the contrary of appellants' contention. And certainly this record demonstrates no "particularized need" on appellants' part for such testimonial record

6. In 1966 an amendment added another sentence to Rule 14:
   "In ruling on a motion by a defendant for severance the court may order the attorney for the government to deliver to the court for inspection *in camera* any statements or confessions made by the defendants which the government intends to introduce in evidence at the trial." Rule 14, Fed.R.Crim.P.

for use at this trial. Dennis v. United States, 384 U.S. 855, 870, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966); United States v. Proctor & Gamble, 356 U.S. 677, 681, 78 S.Ct. 983, 2 L.Ed.2d 1077 (1958); United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940).

▪ We have examined the claims of violations of the Jencks Act, 18 U.S.C. § 3500 (1964), in the fact that agents' interview notes after being turned into 302 Reports were destroyed. We are able to find no testimony which shows that these notes were "statements" within the meaning of the Jencks Act. Cf. United States v. Lonardo, 350 F.2d 523 (C.A.6, 1965). Appellants were furnished the 302 Reports—in some instances considerably in advance of any statute requirement. We find no reversible error. Campbell v. United States, 373 U.S. 487, 83 S.Ct. 1356, 10 L.Ed.2d 501 (1963).

▪ Defendant Turner did not suffer abuse of constitutional rights [7] by being required to surrender shoes for comparison with foot tracks found at the scene. Holt v. United States, 218 U.S. 245, 31 S.Ct. 2, 54 L.Ed. 1021 (1910); Schmerber v. State of California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966).

▪ This court has previously held that facts such as those in this record constitute an offense under the Federal Train Wreck Act. United States v. Stanley, supra. Nothing contained in this record appears to us to argue for reversal of *Stanley*.

This court has absolutely no doubt, from our now extensive acquaintance with this record, that these men did exactly what the jury found them guilty of doing. And as we have indicated above, we have no doubt either that they were accorded their legal and constitutional rights—as those were construed at the time—at arrest, in custody, and at trial.

From the beginning this court has been aware that this was no ordinary criminal trial and that these men are no ordinary criminals. In the eloquent plea made by their very able volunteer counsel at the hearing on sentence, they were pictured as driven to desperation by the harsh facts of the declining coal industry and by abandonment of their own union.

However this may be, there are many forms of social protest legally permitted or actually tolerated because not forbidden. But dynamiting railroad bridges is not among them. And in all fairness to counsel, their argument may not be read as suggesting that it should be. Any sentence for this offense would have to be such as to make it obvious that blowing up bridges was not among the accepted forms of social protest.

It is obvious to us that the District Judge took many factors both from the background of this bitter and unresolved conflict and from the personal and family situations of defendants into account at sentencing. If appellants fail in the main thrust of their argument with the Supreme Court, as they have with us, they still have an opportunity under federal law to seek further consideration of the sentences by the District Judge by an appropriate motion under Rule 35, Fed.R.Crim.P.

Affirmed.[8]

---

7. There is credible evidence that he surrendered the shoes voluntarily.

8. The lengthy delay in the release of this opinion has been occasioned by two factors. First, as noted, we awaited the decision of the crucial matters in this case by the United States Supreme Court in the *Miranda, Johnson* and *Davis* cases.

   Second, after the opinion in this case had been prepared and served, but before final checking of the opinion against the record had been possible for all participating judges, a box of court correspondence containing the only transcript of this record available to the court was lost in transit in first class United States mail. The most thorough sort of search having been inaugurated and pursued by the postal authorities did not result in recovery of the transcript. Thereafter steps had to be taken to replace the transcript with a copy stipulated to by the parties as a copy of the original.

APPENDIX—TRIAL EXHIBIT 2

APPENDIX — TRIAL EXHIBIT 3