UNITED STATES of America,
Plaintiff-Appellee,

v.

William Edmund HINDMARSH,
Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Charles Edward HINDMARSH,
Defendant-Appellant.

Nos. 17252, 17430.

United States Court of Appeals
Sixth Circuit.

Jan. 10, 1968.

**138**

R. Edward Tepe, Cincinnati, Ohio (Court appointed), for appellant William Edmund Hindmarsh.

William J. Dammarell, Cincinnati, Ohio (Court appointed), for appellant Charles Edward Hindmarsh.

Joel M. Shere, Asst. U. S. Atty., Detroit, Mich., for appellee, Lawrence Gubow, U. S. Atty., Detroit, Mich., on brief.

Before WEICK, Chief Judge, and O'SULLIVAN and PHILLIPS, Circuit Judges.

O'SULLIVAN, Circuit Judge.

This cause presents the appeals of William Edmund Hindmarsh and his brother, Charles Edward Hindmarsh, from their conviction upon jury trial of aiding and abetting the armed holdup of a federal credit union (Count II) and conspiring to commit the robbery with two gunmen who carried it out (Count III). Title 18, U.S.C. §§ 2(a), 371, 2113(a) and 2113(g). We affirm the judgments of the District Court.

On August 21, 1964, two gunmen entered the Redeemer Parish Federal Credit Union on West Vernor, Detroit, Michigan, at gun point had its employees lie on the floor, and robbed the establishment of approximately $3,000. Escape was made in an automobile which had been appropriately stationed for such purpose.

The government's evidence established that a Paul Junior Shampo and a Raymond Cordy were the gunmen; appellant William E. Hindmarsh was the driver of the getaway car; appellant Charles E. Hindmarsh had "cased" the premises, provided his brother with the getaway car, furnished the needed guns, and had joined his brother and one of the gunmen in a briefing session a night or two before the robbery; he was denied actual participation in the affair by his wife's confinement and delivery of a son on the day of the robbery. One of the gunmen, Raymond Cordy, charged in Count I with committing the robbery, was tried and convicted with the Hindmarsh brothers. He has not appealed. The other gunman, Paul Shampo, pleaded guilty and testified for the government at trial. The appellants were each given concurrent prison sentences of twenty years and five years under Counts II and III, respectively.

Both of the Hindmarshes made written confessions of their guilt. They initially attempted to plead guilty upon being taken before a United States District

Judge shortly after their arrests in mid-December, 1964. The Judge refused to accept such pleas. Upon arraignment, defendants stood mute and pleas of not guilty were entered. Several weeks later both appellants appeared with their attorneys before then District Judge Wade H. McCree, and moved to withdraw their pleas of not guilty and enter guilty pleas to aiding and abetting the holdup as charged in Count II. The District Judge accepted the guilty pleas after determining that they were voluntary. He conducted a searching inquiry that would satisfy the most exacting champion of the rights of the criminally accused. Several weeks later, however, appellants moved to withdraw their guilty pleas. Their motions were allowed.

The appeal of William Hindmarsh presents essentially one issue: should his confession, given to an agent of the Federal Bureau of Investigation, have been denied admission into evidence on the grounds either that it was, under recent teachings of the United States Supreme Court, involuntary, or had been improperly obtained by federal officers cooperating in a "working arrangement" with local police officers (Anderson v. United States, 318 U.S. 350, 63 S.Ct. 599, 87 L.Ed. 829 (1943)) after the local officers had denied appellant access to counsel in violation of his rights under Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964). If the means employed to obtain the confession of William Hindmarsh offended the rules announced by the Supreme Court in those decisions, his conviction must be reversed, regardless of the weight of the other evidence against him. Escobedo v. State of Illinois, supra, at 491, 84 S.Ct. 1758; Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964); Haynes v. State of Washington, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963); Lynumn v. State of Illinois, 372 U.S. 528, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963).

Appellant Charles Hindmarsh presents three questions on appeal: (1) Was his own confession, given to the FBI several days after he had been advised that the Court would appoint counsel for him, inadmissible under Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964) and Escobedo v. State of Illinois, supra; (2) Did the Court err in not deleting sua sponte his name from William's confession; and (3) Did the Court err in allowing codefendant Shampo to testify to an inculpatory statement made to him by Charles Hindmarsh two days after the robbery?

### 1. Confession of William Hindmarsh.

The contention made can be relevantly assessed only if the factual picture surrounding the confession is set out in some detail. As is typically the case where a confession is alleged to have been improperly obtained, the several versions offered of the "historical facts," Culombe v. Connecticut, 367 U.S. 568, 603, 81 S. Ct. 1860, 6 L.Ed.2d 1037 (1961), are materially in conflict. Hindmarsh's own accounts of the facts exhibit variations and contradictions. We fairly review the facts as follows.

a) Conduct of Detroit Officers on Night of December 13.

The Redeemer Federal Credit Union holdup occurred August 21, 1964. It was a federal crime, 18 U.S.C. §§ 2113(a) and (g), and the Federal Bureau of Investigation had it under investigation from then until its solution on December 14 and 15, 1964. During the same period the Detroit Police Department was continuously seeking solutions to the ever-increasing number of armed robberies and the killings that so often accompany them. Quite evidently, the FBI agents at Detroit and the Detroit Police are in touch with and aid each other by exchanging information. There had been a Detroit bar holdup on December 10, 1964, in which a patron or employee of the bar had been shot. In seeking solution of this and other robberies, the Detroit Police took into custody one Paul Shampo, who gave them information

which put both of the appellants Hindmarsh under suspicion.[1]

On Sunday evening, December 13, 1965, three Detroit police officers and one Clawson, Michigan, officer arrested William at his home in Clawson. While the police were on their way to the Clawson station, William's wife called a Clawson lawyer, Steven M. Andrews, who arrived at the station before the police. While there is disagreement as to the total context of the events at the police station, attorney Andrews was there denied opportunity to consult with his client. William was not interrogated, nor did he make admissions at Clawson. The attorney was told that Hindmarsh was in custody of the Detroit police and that if he cared to talk to him, he should follow the officers to the Detroit Police Headquarters several miles away. Andrews chose not to do so, but called his client's wife and told her to have a lawyer go to the Detroit police station. He gave her the name of two lawyers that she might call. No attorney came to Detroit that night. Upon arrival in Detroit, Hindmarsh was placed in a cell. Approximately two hours later, at about 10:00 P.M., he was questioned by two Detroit detectives, Arnold and Yakush, about his possible participation in some Detroit robberies, including the one which involved a shooting. He testified, "I was accused of many things," and that he wanted to see his attorney whom he thought had come from Clawson. The officers truthfully told him that no attorney had come to see him; he said that he would like to see an attorney before he would make any statement. This conference lasted about one-half to three-quarters of an hour; the officers learned nothing from him and he was returned to a cell without any further questioning. He was allowed to, and did, call his wife, telling her to get an attorney to the station. He said he told her that "these people would not let me see an attorney." The fact is that no attorney attempted to see him there. Nothing further occurred that night.

b) Conduct of Detroit Officers on Morning of December 14.

The next morning, December 14, after breakfast, William was brought from his cell and asked to go in a lineup. He said he would not do so without seeing an attorney. He was accordingly not put in the lineup, but was returned to his cell. Some time thereafter he was again questioned by the Detroit officers for approximately a half hour. He learned from a Detroit Police Lieutenant, Arnold, that Paul Shampo, also then in custody, had implicated Charles as well as himself in the credit union holdup; at the suggestion of the Lieutenant, he and Shampo had a private conference in which Shampo emphasized that they were both involved as suspects in some Detroit robberies including the shooting affair, as well as the credit union robbery. Hindmarsh testified that he *assumed* that Shampo was guilty of the shooting and that he *assumed* that Shampo *assumed* that William was also involved in the shooting.[2] Shampo told him, Hindmarsh said, that the police had told him, Shampo, that if he would "go federal" and plead guilty to the Credit Union rob-

1. It is obvious that the police were not without justification for suspecting the Hindmarshes. Upon cross examination of a Detroit police officer by Charles Hindmarsh's own attorney, it was disclosed that as the driver of the car—"the wheel"—or otherwise, Charles Hindmarsh had, by his own admission taken part in robberies of four bars, three in Detroit and one in Monroe, Michigan, the robbery of the Coop Credit Union and a branch office of the Michigan Secretary of State. At the times here involved, Charles was awaiting sentence in the Fed-

eral District Court for what he identified as an "FHA" case. William Hindmarsh was on probation for a "bad check" case and had an earlier conviction in what he called a "drug" case. Charles was 28 years old and William 29 at the time of the crime here involved, and both were quite articulate and sophisticated.

2. Just how his friend Shampo would erroneously assume that Hindmarsh was part of a shooting affray carried on by Shampo, when in fact Hindmarsh had nothing to do with it. is but one of many claims that are hard to follow.

bery, he would get 90 days, the state charges would be dropped and Shampo would thus avoid exposure to a life sentence should the wounded bar patron die. It was suggested too that the reward for "going federal"[3] would also be available to Charles Hindmarsh. Learning that his brother Charles was also a suspect in the state robbery charges, as well as the credit union holdup, and without consultation with Charles, William decided to get him involved in the enterprise of "going federal" by identifying Charles as a participant in the federal crime of which they both were, nevertheless, innocent.[4] There is much more that could be written to make quite understandable the District Judge's and the jury's finding that William Hindmarsh's confession was voluntary and that his own story of its genesis was sheer fantasy.

At trial, William said that his confession's factual recital was pure fiction— made up by him more or less on the spur of the moment—after he had learned that he was suspected of participation in the credit union robbery and the armed robbery of a Detroit bar. His confession was prompted, he said, because although innocent of both crimes, he planned to parlay his false confession of the lesser federal crime into escape from prosecution for the shooting affair.

c) Other Circumstances Surrounding William Hindmarsh's Confession.

It is quite obvious that the Detroit police had been told by their prisoner Shampo that William Hindmarsh was involved in the Redeemer Credit Union holdup and had advised the FBI of this possible solution to their investigation of the federal crime. An FBI agent, Donovan, was sent by his superiors to Detroit Police Headquarters to interview Hindmarsh on the morning following his arrest. Hindmarsh did not ask for an attorney after talking with Shampo; he went into a room where FBI agent Donovan was seated and told him the story which the agent wrote down. He was fully warned of his constitutional rights by Donovan. After Donovan completed the writing, Hindmarsh said he would not sign it until he had talked with his wife.

Immediately after the above interview, somewhere around ten or eleven o'clock, Detroit officers took William to the Detroit Recorders Court either for arraignment on a state robbery charge or in response to a writ of habeas corpus that a lawyer had obtained. This confusion is of little importance here. Suffice it to say that a prominent Detroit lawyer was there on behalf of Hindmarsh, his presence and activity having been arranged through Hindmarsh's wife.

The Recorders Court Judge was advised that Hindmarsh would be arraigned that afternoon on the Redeemer Credit Union charge and the Recorders Court proceeding was suspended. Hindmarsh and the attorney then conferred. Hindmarsh testified that when this attorney requested a fee of $2,500 for handling his case, he refused the lawyer's services. Hindmarsh indicates that he did not use the opportunity thus presented to discuss with this attorney whether he should sign his already prepared confession; neither did he mention the subject to the Recorders Court judge.

Hindmarsh was returned to Police Headquarters where after lunch and a private telephone conversation with his wife, he signed the confession.

It reads:

"My name is William Edmund Hindmarsh. I live at 1176 Hendrickson, Clawson, Michigan. I was born July 28, 1935, at Detroit, Michigan.

"On August 21, 1964, at about 11:00 A.M. Paul Shampo, Raymond Cordy and me drove a 1964 Plymouth automobile, which my brother Chuck Hind-

---

3. This case provides the writer's first acquaintance with the phrase "go federal". We assume it is the coinage of today's criminal sophisticates to express their view that the federal milieu has become more comfortable than the harsh-ness they find in the state courts and officers.

4. Asked why he would implicate his brother without talking to him William replied "Well, it was bargain day, sir."

marsh, had rented under the name of Edward C. White, from the Rent-a-Car Company, to the Holy Redeemer Federal Credit Union on West Vernor just west of Junction in Detroit, Michigan.

"I was driving and I parked the car in the lot in the rear of the Credit Union. I stayed in the car. Paul Shampo and Raymond Cordy entered the Holy Redeemer Federal Credit Union office and robbed it.

"They both had on sun glasses. Paul Shampo had on a green suede hat. Raymond Cordy had on a brown or black felt hat. Paul Shampo had a .38 caliber revolver. Raymond Cordy had a .32 caliber revolver.

"They were wearing plastic gloves. They got about twenty-nine hundred dollars in this robbery and returned to the car where I was waiting.

"I drove onto the expressway, the Edsel Ford Expressway, and went to Dearborn, Michigan, to my mother's house on Kingsley Street where we changed the license plates on the car.

"We then left in the car and I dropped them off and went home.

"I got nine hundred dollars for my share of this robbery.

"My brother, Charles Hindmarsh, who helped case this robbery, got three hundred dollars from the robbery for his part.

"Charles Hindmarsh had been in this Credit Union building looking it over on numerous occasions."

The foregoing was preceded by this acknowledgment of the FBI warning:

"I have been advised of the identities of Detective Lieutenant Dudley Arnold, Holdup Squad, Detroit Police Department, and S. A. Richard J. Donovan, Special Agent of the FBI and that I am not required to make any statement, and any statement I do make may be used against me in a court of law.

"No threats or promises of any kind have been made to me to get me to make this statement.

"S. A. Richard J. Donovan has told me that I have a right to talk to a lawyer of my own choice or anyone else before saying anything at all, and that if I cannot pay for a lawyer, the judge will get one for me."

The confession ended with the following, in William Hindmarsh's own handwriting:

"I have read this statement consisting of two pages and it is true and correct to the best of my knowledge.
"William E. Hindmarsh
12/14/64"

He was then taken before United States District Judge Freeman. He testified:

"I told Judge Freeman I would like to have an attorney and that I was guilty, that I signed this statement, and that, you know, that I would like to see an attorney. Mainly I told him that I would like to get it over with."

It would unduly lengthen this opinion to set out all of the things Hindmarsh said to support his claim that his confession was involuntary and obtained by impermissible methods. He told of promises made to him by Detroit detective Arnold and FBI Agent Donovan of what he would gain by "going federal." The testimony of these officers can be fairly read as substantial denial of the critical parts of his various stories. The District Judge in finding the confession voluntary, and the jury in returning its verdict, apparently viewed Hindmarsh's variety of claims as transparently false.[5]

Because the recent and exciting landmark decisions that have limited the use of confessions to obtain convictions were written in the context of their own facts,

5. A short example of this is that Hindmarsh's first account of his confession to Donovan, given on his pretrial motion to suppress it, was that the FBI Agent had it all written out before Hindmarsh entered the room to talk to the agent. When he testified before the jury, he described Donovan writing down the facts as he gave them.

with not a little attention to the intellectual capacities and the sophistication, or lack of it, of those found to be abused by police methods,[6] we add the following which we think of relevance to the claims of William Hindmarsh and also of his brother Charles, whose charges of error we consider later herein.

After the District Judge, on April 27, 1965, allowed William and Charles Hindmarsh to withdraw their pleas of guilty, the matter rested for about eight months during which time it would appear that cases involving confessions were studied for their controlling facts. On the imminence of trial, December 27, 1965, a motion was made to suppress William Hindmarsh's confession. The circumstances relied upon to support the claim that his confession was involuntary were much broadened over those assigned in support of his motion to withdraw his plea of guilty. The motion to suppress concluded:

"14. That finally, following the interrogation above described, a handwritten alleged confession was submitted to the defendant for his signature, said defendant did not write out said confession nor did he read it but was so apprehensive and fearful as a result of the aforementioned periods of interrogation that he signed said alleged confession."

The District Judge held an evidentiary hearing on the motion at which William and the involved Detroit police officers and the FBI agent testified. The District Judge held that the confession was voluntary but granted the motion to suppress upon his then view that Anderson v. United States, 318 U.S. 350, 63 S.Ct. 599, 87 L.Ed. 829 (1943) required such action. He then felt that since Anderson applied, the initial conduct of the Detroit officers in denying Hindmarsh an opportunity to see attorney Andrews when he was first in custody at the Clawson police station, being at that point a violation of the *Escobedo* rule, rendered the later confession given to agent Donovan the inadmissible product of an illegal "working arrangement" between the Detroit police and the FBI. At trial which followed immediately, the District Judge changed his ruling upon his then view that the matter was controlled under the facts of United States v. Coppola, 281 F.2d 340 (2d Cir., 1960), affirmed per curiam 305 U.S. 762, 81 S.Ct. 884, 6 L. Ed.2d 79 (1961), not called to his atten-

6. In Escobedo v. State of Illinois, supra, the Court began its opinion by saying "The critical question in this case is whether, *under the circumstances,* * * *." Id. at 479, 84 S.Ct. at 1759. One of these circumstances was that Escobedo was "a 22-year old of Mexican extraction with *no record of previous experience with the police.*" Id. at 482, 84 S.Ct. at 1760. (Emphasis added.) See also Stein v. People of State of New York, 346 U.S. 156, 185–186, 73 S.Ct. 1077, 1093, 97 L.Ed. 1522 (1953), reh. denied, 346 U.S. 842, 74 S.Ct. 13, 98 L.Ed. 362: "What would be overpowering to the weak of will or mind might be utterly ineffective against an experienced criminal. * * * These men were not young, soft, ignorant or timid. They were not inexperienced in the ways of crime or its detection, nor were they dumb as to their rights." And see Reck v. Pate, 367 U.S. 433, 441–442, 81 S.Ct. 1541, 6 L.Ed.2d 948 (1961).

In Anderson v. United States, 318 U.S. 350, 355, 63 S.Ct. 599, 601, 87 L.Ed. 829 (1943) the Court said: "In the McNabb case [McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943)] we have held, * * * that incriminating statements obtained *under the circumstances* set forth in that opinion cannot be made the basis for convictions * * *. The considerations which led to that decision also govern this case." (Emphasis added.) Under these circumstances the court found, at 356, 63 S.Ct. at 602, that "there was a working arrangement between the federal officers and the sheriff of Polk County which made possible the abuses revealed by this record." In Massiah v. United States, 377 U.S. 201, 207, 84 S.Ct. 1199, 1202, 12 L.Ed.2d 246 (1964) the Court concluded: "All that we hold is that the defendant's own incriminating statements, obtained * * * *under the circumstances* here disclosed, could not constitutionally be used * * *." (Emphasis added.)

tion until after his initial ruling on the motion to suppress.

■ Obedient to the rule of Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), he made his own finding that William's confession was voluntary and then, under instructions, the propriety of which is not questioned, submitted that question to the jury. William testified before the jury. His recitation of alleged police misconduct was expanded and embellished. There was evidence in addition to the confession which could have led the jury to their verdict of guilty so we do not know the view they took of its voluntariness. Complying with Davis v. State of North Carolina, 384 U.S. 737, 741–742, 86 S.Ct. 1761, 1764, 16 L.Ed.2d 895 (1966), wherein the Supreme Court said:

"It is our duty in this case, however, as in all of our prior cases dealing with the question whether a confession was voluntarily given, to examine the entire record and make an independent determination of the ultimate issue of voluntariness,"

we find as a fact that William Hindmarsh's confession was voluntary. Cf. Jacobellis v. State of Ohio, 378 U.S. 184, 188, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964).

d) Questions Under Escobedo and Anderson.

Having set out the facts at length, we think the legal conclusions follow without need for fresh dissertation on the already abundant literature on confessions. We refer generally to the opinion of this Court written by Judge Edwards in the case of United States v. Hensley, 374 F. 2d 341 (6 Cir., 1967), which can indeed be relevantly read as expressing this Court's views on the subject.

As noted above, William Hindmarsh places chief reliance on Anderson v. United States, supra, and Escobedo v. State of Illinois, supra. We doubt that the rule of *Escobedo* requires the exclusion of a statement, *whenever given under whatever circumstances,* merely because, as in this case, there was an initial refusal to allow counsel to talk with an accused. The evidence in this case convinces us that there was no denial of counsel after Hindmarsh arrived at Detroit Police Headquarters, and no admissions of any kind had been made prior thereto.

Although the Supreme Court gave strong commands in Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), its holding in *Escobedo* explicitly referred to the facts of that case. Besides Escobedo's lack of sophistication it was noted that he was persistently questioned while standing up, handcuffed,[7] nervous, with circles under his eyes, for a period of about four hours. His lawyer was in the police station several hours trying to get to him, during which time the police "grilled" Escobedo, and finally got a confession from him. His ignorance of his rights was noted. And at 490–491, 86 S.Ct. at 1636 the Court recognized the continuing relevancy of the principle of Crooker v. State of California, 357 U.S. 433, 78 S.Ct. 1287, 2 L.Ed.2d 1448 (1958), reh. denied 358 U.S. 858, 79 S.Ct. 12, 3 L.Ed. 2d 92, and Cicenia v. La Gay, 357 U.S. 504, 78 S.Ct. 1297, 2 L.Ed.2d 1523 (1958), that not "every state denial of a request to contact counsel [is] an infringement of the constitutional right *without regard to the circumstances of the* case." (Emphasis in original.)

■ In Johnson v. State of New Jersey, 384 U.S. 719, 733–734 (1966), it was decided that the *Escobedo* and *Miranda* decisions would be applicable only to trials commenced after the respective dates of those decisions—in the case of *Miranda,* June 13, 1966—and we need not, therefore, test the admissibility of the Hindmarsh confession against the rules of that case. As dictum, however, we express a view that the facts of the *Westover* part of the *Miranda* decision, 384 U.S. at 494–497, 86 S.Ct. 1602, would

7. Whether to fit the facts of *Escobedo* or not, Hindmarsh first testified that when taken to the police station he had been, like Escobedo, handcuffed "behind his back" but later admitted that such claim was not true.

provide ground for distinguishing it from the case at bar. The facts of this case do not present the appearance of compulsion. It was not until Hindmarsh told the officers that he guessed a lawyer was not going to show up and himself decided to "talk," that any admissions were obtained from him. At that point, Detective Arnold made an attempt to advise Hindmarsh of his rights and Hindmarsh responded, "I know my law * * it is just your word against mine." It was then that Hindmarsh volunteered to the detective what the Detroit police had already been told by Shampo—that he and his brother Charles had been involved in the federal crime. Hindmarsh then had his interview with his friend Shampo and decided, as he says, "to go federal" rather than face state charges. The factfinders—the District Judge and the jury—had the right to believe the officers and Shampo in their denial that a "deal" (dropping of state charges) was offered to Hindmarsh. After his visit with Shampo, appellant said he was ready to make a statement to the FBI. Hindmarsh testified at the hearing on his motion to suppress his confession that FBI agent Donovan purposely made errors in writing out the confession so that Hindmarsh would have to initial them, thus giving the appearance that he had read the confession.[8] When before the District Judge at the time he pleaded guilty, he corrected an inadvertent mistake of the judge in reading the indictment. He said, "Your honor, I wanted to plead guilty to the aiding and abetting of it." (Count II). As the trial judge stated at one point, "You see, there is a certain wisdom that pervades the community of people who have had some contact with the law, and we know Mr. Hindmarsh has."

Even were we to indulge a legal conclusion that the Detroit police conduct was impermissible under *Escobedo,* we do not consider that *Anderson* required denial of the use of the confession obtained by the FBI. The facts here bear no resemblance to those involved in *Anderson.* There a group of striking miners, suspected of dynamiting TVA power lines supplying the struck company with power, were herded into the company owned YMCA by the local sheriff and company paid deputies. Within a day or two of the dynamiting, six federal agents had appeared to carry on the questioning of the suspects. Some of the prisoners were held as long as six days without production before a magistrate as required by Tennessee statute. Only after confessions had been obtained by the federal agents through intermittent questioning were federal warrants obtained and the prisoners taken before a United States Commissioner. The Supreme Court's characterization that,

> "Unaided by relatives, friends, or counsel, the men were unlawfully held, some for days, and subjected to long questioning in the hostile atmosphere of a small company-dominated mining town." 318 U.S. at 356, 63 S.Ct. at 602,

exhibits *Anderson's* inappositeness here.

We share the view of the District Judge that United States v. Coppola, 281 F.2d 340 (2nd Cir., 1960), aff'd per curiam, 365 U.S. 762, 81 S.Ct. 884, 6 L. Ed.2d 79, supports the correctness of admitting William Hindmarsh's confession. There, as here, the defendant was suspected of both state and federal crimes. The Buffalo police and the FBI exchanged what information they had in the matter. Coppola was arrested for questioning about state offenses on a

8. At one point the District Judge observed that "Mr. William Hindmarsh is a sophisticated person who was not at all unaware of what was going on, not the least of the factors which caused me to make this finding was his awareness of what is rather a common interrogation practice of making deliberate errors in a statement to induce the person who is supposed to sign it to correct these errors so that later they may be pointed to to indicate that he did in fact read it. This negatives the frequently heard argument, well I didn't even read it. Well, you changed this and that and so on. Now, he was that sophisticated and this is why I made my finding."

state warrant and was held in custody without arraignment longer than New York law permitted. During this time, the FBI, after warning Coppola of his constitutional rights, obtained admissions relevant to the federal crime, and these were admitted in evidence. As in the case at bar, there was "no evidence of any coercion, mistreatment or abuse" of Coppola; there was no claim of delay in arraigning the prisoner after the federal charge was lodged. In our case, Hindmarsh was arraigned before a United States District Judge at 3:00 P.M., the regular hour for the afternoon arraignments in the United States District Court at Detroit. He had been in custody of the Detroit police until after 11:00 A.M., the time for morning arraignments.

■■ The prime factor distinguishing *Coppola* and this case from *Anderson* is that the detention by state officers was not *for the purpose of aiding and abetting the federal officers* in carrying on interrogation of the suspect in violation of Federal Rule 5(a) requiring prompt arraignment, or in violation of other of his rights. It is true that the FBI had learned on the afternoon of Hindmarsh's arrest that Shampo had implicated Hindmarsh in the federal offense as well as the state crimes. The FBI also knew that Hindmarsh would probably be picked up for the state offenses. But there was no "working arrangement" such that the arrest and detention of Hindmarsh was in truth for the federal offenses. As was said in *Coppola,*

> "The rule excludes confessions when the 'working arrangement' includes the illegal detention—in other words, when federal law enforcement officers induce state officers to hold the defendant illegally so that they may secure a confession. However, to bring a case within this rule there must be facts, as there were in *Anderson,* not mere suspicion or conjecture." 281 F.2d at 344.

Accord, United States v. Frazier, 385 F. 2d 901 (6th Cir., Nov. 20, 1967); Evans v. United States, 375 F.2d 355 (8th Cir.,

1967); Young v. United States, 344 F.2d 1006 (8th Cir., 1965), cert. den., 382 U.S. 867, 86 S.Ct. 138, 15 L.Ed.2d 105; United States v. Sailer, 309 F.2d 541 (6th Cir., 1962), cert. den., 374 U.S. 835, 83 S.Ct. 1884, 10 L.Ed.2d 1057; Stephenson v. United States, 257 F.2d 175 (6th Cir., 1958). But see United States v. Tupper, 168 F.Supp. 907 (W.D.Mo.1958).

■ We will not hold that the rights of an accused, constitutional or otherwise, forbid all collaboration between state peace officers and the FBI. We all accept as proper the Second Circuit's observations in *Coppola:*

> "If there is to be effective law enforcement, it is to be expected that every police agency, be it state, county, city or federal, will cooperate and exchange information. Probably the F.B.I. and local police have in countless cases the same crimes and the same suspects on their books." 281 F.2d at 345.

2. No. 17,430, Charles Hindmarsh.

We shortly discuss appellant Charles Hindmarsh's charges of error.

a) Admissions to FBI.

■ Between the time of his arrest on the evening of December 14, 1964, and his appearance in the United States District Court at 3:00 P.M. the next day, Charles Hindmarsh confessed his part in the crime here involved. He had been arrested by Detroit officers upon a federal warrant and was held in the Detroit police headquarters while they continued investigating his participation in some state robberies. The District Judge suppressed this confession as having been obtained during a period of delay that was unreasonable under F.R.Crim.P. 5 (a).

After Charles' appearance on the federal complaint on December 15, and prior to the appointment of counsel for him, after adequate advice of all of his constitutional rights by an FBI agent, he made incriminating oral admissions to the agent. They were received in evidence over objection. Charles contends that under Massiah v. United States, 377

U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964) these admissions should not have been received in evidence. In his brief to this Court, Charles assumes that an attorney had been, or was about to be, appointed for him when he made the admissions to the FBI agent on December 17. A transcript of what took place before Judge Freeman on December 15 has been certified to us as part of the record. After a conversation with Charles' codefendant, Cordy, the following exchange was had between Judge Freeman and Charles:

"The Court: * * * You are charged with robbery of a Federal Credit Union at 5671 West Vernor Highway here in Detroit. The purpose of this—well, I would like to first inquire, then, you are Charles Edward Hindmarsh?

"Defendant Hindmarsh: Yes, your Honor.

"The Court: Do you have a lawyer?

"Defendant Hindmarsh: No, I don't.

"The Court: Have you received a copy of this complaint?

"Defendant Hindmarsh: Yes, I have.

"The Court: And you've heard me relate generally the nature of the charge?

"Defendant Hindmarsh: Yes, I have.

"The Court: I would like to inform both of you defendants that the purpose of this arraignment is to inquire of you whether you desire a preliminary hearing. The purpose of a preliminary hearing—I'm not talking about the trial of the case, but a hearing preliminary to the trial at which the Government would be called upon to present evidence in support of this charge, and the Court would then determine whether there is probable cause to believe that you men, or either of you, committed the offense; and if so, if you would be the one as to which probable cause is established, you would be held for the Grand Jury. Do you desire such a hearing?

"Defendant Cordy: No, we're going to plead guilty.

"Defendant Hindmarsh: We're going to plead guilty.

"The Court: You want to plead guilty?

"Defendant Cordy: Yes, sir.

"The Court: Well, of course, you can't plead guilty to this, as perhaps you already know. I had the other two defendants in here yesterday, I think, and I so advised them that you can't plead guilty to this complaint, but you have the privilege of doing one of two things: you can demand a hearing, a preliminary hearing, or you can waive it.

"Defendant Hindmarsh: I'd like to waive it.

"The Court: Now, you are Mr. Hindmarsh?

"Defendant Hindmarsh: Hindmarsh."

No attorney was appointed for Charles until December 21. This was four days after the admissions which followed proper warnings. There is no claim or evidence that Charles Hindmarsh's above admissions, if made, were involuntary. Charles denied them in part. In *Massiah* the accused had been indicted on a narcotics charge; had retained counsel; pleaded not guilty; and was out on bail. Government agents surreptitiously got an alleged confederate of Massiah to allow them to install a radio transmitter in the confederate's automobile. Massiah made damaging admissions, heard over the radio by a government agent. Reversing Judge Lumbard for the Second Circuit, a majority of the Supreme Court held that Massiah's admissions, thus surreptitiously obtained after indictment, plea of not guilty, and in the absence of Massiah's retained counsel, should not have been received. The facts of this case do not fit *Massiah* and we find no reason to expand *Massiah* to embrace them. See United States v. Hensley, supra, 374 F.2d at 351.

b) Instruction on Codefendant's Confession.

 Twice during the giving of testimony and again in his instructions to the jury, the District Judge advised the jury that admissions, outside of those made during and in furtherance of a conspiracy, could be considered by them only as to the guilt of the one making such admissions. Error is charged in the failure of the District Judge, sua sponte, to have deleted Charles Hindmarsh's name before exhibition or reading of his brother's confession to the jury.

We find this without merit. Delli Paoli v. United States, 352 U.S. 232, 77 S.Ct. 294, 1 L.Ed.2d 278 (1957). The test in *Delli* is "whether the instructions were sufficiently clear and whether it was reasonably possible for the jury to follow them." Id. at 239, 77 S.Ct. at 298. Considering the evidence as a whole we are of the opinion that the instructions met these tests and that no prejudice resulted to Charles Hindmarsh requiring reversal. See Garcia v. United States, 315 F.2d 679 (5th Cir., 1963); United States v. Sykes, 305 F.2d 172 (6th Cir., 1962); rev'd on other grounds sub nom. Preston v. United States, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964); and Carter v. United States, 304 F.2d 881 (5th Cir., 1962). But see United States ex rel. Floyd v. Wilkins, 367 F.2d 990 (2nd Cir., 1966); United States v. Bozza, 365 F.2d 206 (2nd Cir. 1966); and United States v. Gordon, 253 F.2d 177, 183 (7th Cir., 1958). See also Gilbert v. State of California, 388 U.S. 263, 268, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967), where the Supreme Court declined reconsideration of its holding in *Delli*.

c) Post-conspiracy Admission.

 The witness Shampo, one of the chief actors in the holdup in question, testified that a day or two after its occurrence Charles Hindmarsh met him and said, anent the robbery, that "he was sore because it was his job. * * * he was supposed to go on it." Considered in the context that Charles had "cased the joint" (the Federal Credit Union), had provided one or more of the guns used, had stolen license plates to be used on the getaway car in the robbery, and

had removed and thrown them away after the robbery—Charles' pique at being denied participation by the intervention of his wife's confinement and delivery of a son is understandable. Relying on the rule that coconspirators' statements made after the termination of a conspiracy are not admissible against the alleged coconspirators, Charles urges that reception of the above was error. It was not received as proof of a conspiracy, but as an admission against interest, to be considered only against Charles. It was admissible as to him. Lutwak v. United States, 344 U.S. 604, 618, 73 S.Ct. 481, 97 L.Ed. 593 (1953), reh. denied, 345 U.S. 919, 73 S.Ct. 726, 97 L.Ed. 1352.

We have considered other errors charged by the appellants, and find that they are without merit and do not require discussion.

The judgments are affirmed.