**UNITED STATES of America,**
**Plaintiff,**

v.

**Charles Ruble SISK et al., Defendants.**
**Crim. A. No. 6990.**

United States District Court,
E. D. Tennessee,
Northeastern Division.
Feb. 20, 1968.

See also, D.C., 309 F.Supp. 86.

J. H. Reddy, U. S. Atty., Knoxville, Tenn., for plaintiff.

G. Edward Friar, Knoxville, Tenn., for defendants.

### MEMORANDUM OPINION AND ORDER

NEESE, District Judge.

The defendants were arrested by a special agent of the United States Secret Service and agents of the Tennessee Bureau of Criminal Identification in an automobile parked in the parking area of a motel in the vicinage of McGee Tyson airport near Knoxville, Tennessee at about 1:00 o'clock p. m., Friday, June 2, 1967. Although the state agents had the defendants in arrest beforehand, federal agent James Edward Halderman executed a federal warrant of arrest on the defendants, charging them with a conspiracy to possess and sell certain counterfeit Federal Reserve Bank notes, with intent to defraud, and in furtherance thereof, of possessing and selling one or more such notes, in violation of 18 U.S.C. §§ 472, 473.

After the "re-arrest" of the defendants and a search for weapons, Mr. Halderman advised the defendant Mr. Sisk that " * * * he did not have to say anything; that anything he did say could be used against him; that he was entitled to have an attorney before he said anything; if he wanted an attorney and could not afford one, *that one would be appointed before he went to trial before the United States commissioner. * * *"* [Emphasis supplied.] This defendant testified he thereupon told Mr. Halderman: " * * * I wanted to call a lawyer, that this was a serious charge * * *", and was told by Mr. Halderman, "We will see about that

later. * * * " However, there was no conversation between the two at that time on any subject other than this defendant's desire to "* * * talk to * * * " a lawyer in nearby Townsend, Tennessee. Mr. Sisk testified that he was again assured by Mr. Halderman that "* * * I could take care of that later * * * ", while they were enroute to the office of the airport manager.

Agent Halderman delivered custody of the defendants to Richard C. Quinn, the special agent-in-charge for the Secret Service in the Eastern District of Tennessee, at the aforementioned office. Mr. Quinn advised Mr. Sisk that "* * * he would soon be taken before a United States commissioner. I told him that he did not have to say anything to me, and that anything he did say could be used against him in court, told him he was entitled to a lawyer and that, if he could not afford one, one would be appointed for him. I told him if he could afford one and wanted to call one at that point,[1] that he could; I told him he did not have to answer any question without a lawyer [sic: lawyer's] being present, and that he could stop answering questions any time he wanted to. I told him that then we were going to make an attempt to see when he could be taken before a United States commissioner. * * * " Mr. Quinn was unable to reach the nearest commissioner by telephone and advised Mr. Sisk that he would be taken to Knoxville, "* * * and that I would have to get in touch with the commissioner as soon as we got to Knoxville. * * * " At the airport, Mr. Sisk's effects were searched for evidence of the crimes with which he was charged. After 15 to 45 minutes there, the defendants were taken to the Secret Service headquarters in the federal building in Knoxville.

During the ride of about thirty minutes between the airport and the federal building, Mr. Sisk "* * * commented on the seriousness of the charge, of its nature, and that I wanted a lawyer. * * * " He testified he was told by Mr. Quinn that "* * * we would get to it later, which I assumed we would. * * * " Mr. Sisk was fingerprinted, etc., and Mr. Halderman was the first to interrogate him, at about 2:30 o'clock p. m. Mr. Halderman walked into the room where Mr. Sisk was seated, sat down at a table, produced a form of a so-called "consent to speak", and read it to Mr. Sisk. Therein, *inter alia*, is this language: "* * * If you decide to answer questions now without a lawyer present, you will still have the right to stop the questioning at any time. *You also have the right to stop the questioning at any time until you talk to a lawyer. * * *"* [Emphasis supplied.]

Mr. Halderman read the form to Mr. Sisk, and then permitted Mr. Sisk to read it again himself before executing it. The federal agents then proceeded to interrogate Mr. Sisk. In its progress Mr. Sisk testified that he asked to call a lawyer, whereupon "* * * Mr. Halderman said, 'If you don't want to talk, —okay!' Then he pushed his chair back and got up and went out of the room. * * * " The interrogation at that time produced nothing helpful in the investigation. According to Mr. Halderman, "* * * Every time I asked him [about the case], he would sort of smile and wouldn't answer me. * * * "

Mr. Quinn testified that, immediately on reaching his headquarters, he communicated by telephone with a United States commissioner and met the commissioner subsequently in the offices of the United States marshal, to which office the defendants were brought at about 3:00 o'clock, p. m. Mr. Sisk advised the commissioner that he "* * * didn't know whether or not he wanted an attorney; he would think about it and would, perhaps later, employ one of his own choosing. * * * " A prelim-

---

1. Mr. Sisk testified that at this point he mentioned "* * * that this was a very serious offense, and that I did want a lawyer * * *."

inary hearing[2] was set by the commissioner for a subsequent date. Mr. Sisk was remanded to jail in lieu of bond.

After 8:00 o'clock, p. m., that day, and subsequent to Mr. Sisk's appearance before the commissioner, before whom Mr. Sisk had not indicated his desire for a lawyer, Mr. Quinn conferred with Mr. Sisk in an office space within the jail. Mr. Sisk was again reminded of his aforementioned rights of silence and to counsel. Mr. Quinn related to Mr. Sisk some of the information the investigation had uncovered. " * * * I told him that he could answer questions if he desired to talk with us [two federal agents were present], and he said he did. * * * "[3] A lengthy interrogation[4] ensued, during which Mr. Sisk gave geographic directions by telephone to federal officers searching for a cache of counterfeit money near the Sisk home in Cocke County, Tennessee. Afterward, Mr. Sisk accompanied the officers to his home, where his own telephone was available to him. In the words of Mr. Sisk, anytime he mentioned a lawyer while temporarily away from jail, " * * * The response all the way through was, 'you have got your rights, and you will be allowed them, * * * they told me, but I never got them. * * * "

On their return to the federal building, Mr. Sisk undertook to reach his lawyer in Townsend by telephone, but " * * * as I recall, the line was busy. I tried my residence and nobody answered. * * * " Mr. Sisk was re-incarcerated but again taken out of jail on June 6, 1967 and transported to his grandfather's farm. There, Mr. Sisk showed the agents where a cache of counterfeit currency was buried in a sinkhole.

The federal officers arrested Mr. Sisk under a warrant issued upon a complaint and were required to take him without unnecessary delay before the nearest available commissioner. Rule 5(a), Federal Rules of Criminal Procedure. " * * * The requirement of Rule 5(a) is part of the procedure devised by Congress for safeguarding individual rights without hampering effective and intelligent law enforcement. Provisions related to Rule 5(a) contemplate a procedure that allows arresting officers little more leeway than the interval between arrest and the ordinary administrative steps required to bring a suspect before the nearest available magistrate.

* * * * * *

"The second step in initiating a federal proceeding [is] " * * * to arraign the arrested person before a judicial officer as quickly as possible so that he may be advised of his rights and so that the issue of probable cause may be promptly determined. The arrested person may, of course, be 'booked' by the police. But he is not to be taken to police headquarters in order to carry out a process of inquiry that lends itself, even if not so designed, to eliciting damaging statements to support the arrest and ultimately his guilt.

"The duty enjoined upon arresting officers to arraign 'without unnecessary delay' indicates that the command does not call for mechanical or automatic obedience. Circumstances may justify a brief delay between arrest and arraignment * * *. But the delay must not be of a nature to give opportunity for the extraction of a confession. * * * " Mallory v. United States (1957), 354 U.S. 449, 455, 77 S.Ct. 1356, 1359–1360, 1 L.Ed.2d 1479, 1483 (headnote 4). " * * * Rule 5(a) is not a formality; its purpose is to minimize secret police interrogation of persons under detention; its ultimate aim is to avoid those situations out of which grows the whole system of the 'third

---

2. Mr. Sisk appeared at the hearing without counsel and waived preliminary examination.

3. Even as late as this, no damaging or incriminatory admissions had been secured by the agents from Mr. Sisk.

4. At one point, the jailer admonished the interrogators to keep the door to the office open at all times.

degree'. The evil at which the rule aims is in interrogation in secret and in detention before the arraignment. Its means are arraignment 'without unnecessary delay.' * * *" Coppola v. United States (1961), 365 U.S. 762, 765, 81 S.Ct. 884, 886, 6 L.Ed.2d 79, 81 (dissenting opinion).

■ The Court finds that Mr. Sisk was taken by the officers before the nearest available commissioner without unnecessary delay. Mr. Quinn sought to communicate with the nearest commissioner concerning the arraignment of Mr. Sisk immediately Mr. Sisk came into his custody at the airport. The commissioner was away from his office at lunch. The search for evidence of the crime on which Mr. Sisk had been arrested was a necessary reason for a brief delay at the airport. The delay in time of transportation would have been the same, had the commissioner been available or unavailable at the time Mr. Quinn first sought to contact him by telephone. The first step taken by Mr. Quinn after the arrest party arrived in the federal building, where the arraignment would take place, was to call the commissioner and arrange for the hearing. No more than an hour elapsed from the time Mr. Sisk arrived in the building until he was arraigned.

■ The Court finds further that any incriminating statements made by Mr. Sisk while in custody [5] were the product of voluntary action on his part. He was told immediately he was arrested of his right to silence and to counsel prior to, or any time during, interrogation. His rights to silence and counsel at any time during interrogation were reiterated at the outset of his first encounter with Mr. Quinn, one of the agents to whom he afterward made the incriminating statements. He signed a form stating he had read a statement of his rights, and that it had been read to him, including the following: " * * * you will still have the right to stop the questioning at any time. You also have the right to stop the questioning at any time until you talk to a lawyer. * * *" The form Mr. Sisk signed contains the statements that he understood what his rights were, that he did not want a lawyer, and that he understood what he was doing.

Mr. Sisk was graduated from high school. He earned a livelihood for himself and his family by operating his own substantial business for nearly a decade before his arrest. He was in his middle thirties at the time. In testifying he was articulate. He understood the meaning of words from all the evidence the Court gleaned from his testimony. His use of the English language was generally acceptable.

The Court is not persuaded in the slightest degree that Mr. Sisk did not understand that, at any instant during his custody that he desired, he could have refused to answer any question put to him until his "begging" for legal counsel had been satisfied. There is direct contradiction between the federal officers and this defendant as to whether, when, and how many times he asked for a lawyer. Someone or someones swore falsely under oath in this process. Some of these particular officers have been found to be somewhat overzealous in this Court's experience with their investigations, and this produces something of a credibility gap in some of their testimony. Simultaneously, it is the defendant Mr. Sisk who will be more directly and seriously affected by the

---

5. " * * * We doubt that the rule of Escobedo [v. Illinois (1964), 378 U.S. 478, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed. 2d 977] requires the exclusion of a statement, *whenever given under whatever circumstances,* merely because, as in this case, there was an initial refusal to allow counsel to talk with an accused. The evidence in this case convinces us that there was no denial of counsel after [Sisk] arrived at [the federal building] Headquarters, and no admissions of any kind had been made prior thereto. * * *" United States v. Hindmarsh, C.A. 6th (1968), 389 F.2d 137, 144[2], certiorari denied (1968), 393 U.S. 866, 89 S.Ct. 150, 21 L.Ed.2d 134.

outcome of this prosecution, and this balances the scales against his credibility.

It is not necessary to a decision on this defendant's motion for a suppression of his incriminatory statements, and evidence emanating as the fruits thereof, for the Court now to decide collaterally whether Mr. Sisk was testifying falsely. The Court is convinced beyond a reasonable doubt that, even if Mr. Sisk had clamored for the presence of an attorney to the extent he claimed, he still had been advised, knew and understood that he could have brought any interrogation of himself to a complete cessation any time he wished. Therefrom, the Court finds and concludes that the statements made and actions taken by Mr. Sisk were all voluntary.

 The absence of counsel at the time the uncoerced admissions were made by Mr. Sisk to the investigating officers does not afford grounds to suppress the evidence seized as a consequence of those admissions. *Cf.* Waddy v. Heer, C.A.6th (1967), 383 F.2d 789, 793. The motion of the defendant Sisk for such judicial action hereby is

Denied.