**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Charles MORGAN and Daniel Dresden
DeFoe, Defendant-Appellants.**

**Nos. 17773, 17774.**

United States Court of Appeals
Sixth Circuit.

May 27, 1968.

James S. Shields, Memphis, Tenn., for
appellant Morgan.

**974**

Clyde P. West, Memphis, Tenn., for appellant DeFoe.

William A. McTighe, Jr., Memphis, Tenn. (Thomas L. Robinson, U. S. Atty., Memphis, Tenn., Fred M. Vinson, Jr., Asst. Atty. Gen., Dept. of Justice, Criminal Division, Washington, D. C., on the brief), for appellee.

Before O'SULLIVAN, CELEBREZZE and McCREE, Circuit Judges.

O'SULLIVAN, Circuit Judge.

We consider the appeals of Charles Morgan and Daniel Dresden DeFoe from convictions for their participation in the handling of three $10,000 United States Treasury bearer bonds, which had been stolen from the courthouse in Senatobia, Mississippi, and transported to Memphis, Tennessee. Of a ten-count indictment, Morgan was convicted under Counts I and II which charged, respectively, that on or about November 30, 1965, and in violation of 18 U.S.C. §§ 2314 and 2, he and another "transported in interstate commerce" the described bonds "knowing the same to have been stolen"; and that on or about December 1, 1965, he and others did "receive, conceal and store" the bonds "which were moving as and which constituted interstate commerce * * * knowing the same to have been stolen * * * in violation of Title 18, U.S.C. Section 2315 and Section 2." He received a ten year sentence on each count—to be served concurrently.

DeFoe was convicted under Counts V and X of the same indictment, which respectively charged that on or about January 28, 1966, he and another "did receive, conceal, store and sell" the bonds "which were moving as and which constituted interstate commerce * * * knowing the same to have been stolen, in violation of Title 18, U.S.C. Section 2315 and Section 2"; and "[t]hat on or about December 21, 1965, and continuously thereafter up to and including February 23, 1966" he, Daniel Dresden DeFoe, Charles Morgan, James Thomas Moore and one other did conspire to "receive, conceal, store, barter, sell, and dispose of" the bonds "which were moving as, were a part of and which constituted interstate commerce * * * knowing the same to have been stolen, as proscribed by Title 18, U.S.C. Section 2315, all in violation of Title 18, U.S.C. 371." He received a five year sentence on each count—to be served concurrently.

Appellant Morgan seeks reversal, claiming that his confession of the crime was not voluntary and should not have been received in evidence. DeFoe charges that his acquittal should have been directed, that he should have been granted a severance and that there was error in the District Judge's instructions. We affirm.

### 1. Admissibility of Morgan's confession, No. 17,773.

On the night of November 30, 1965, the Tate County, Mississippi, courthouse at Senatobia, Mississippi, was burglarized, obviously by professionals. After breaking into the building, the burglars bored a hole in a 21-inch masonry wall through which they entered the vault in the Chancery Clerk's office. From a safe they abstracted securities, including three $10,000 United States Treasury bearer bonds. These were transported to Memphis, Tennessee, by Morgan and another; there they were acquired by DeFoe, who sold them for $1,000. State and federal criminal statutes were violated by the transactions and the police authorities of Tennessee and Mississippi and the FBI sought those who had committed the crimes. Investigation turned up clues pointing to Morgan and he was arrested on January 14, 1966, by state officers who confined him in the county jail at Memphis, Tennessee.

Morgan had a long criminal record. He had been under numerous Tennessee charges when he was released on bail on October 31, prior to the Senatobia offense of November 30, 1965. After his above arrest he was named in nine separate Tennessee charges and there was a warrant for him in Mississippi. There

were also charges pending against him from Texas for the alleged theft of an automobile. During Morgan's stay in jail at Memphis, he was talked to by state officers of Tennessee, the Sheriff—A. C. Blair—of Tate County, Mississippi, and FBI agents. They were seeking solution of the breaking and entering at Senatobia, the transportation of the stolen bonds, and other crimes. Later, as discussed below, Morgan dictated a confession, giving a detailed and accurate description of the breaking and entering and the theft of the bonds and identified himself and one Barton as the perpetrators of the crime. In repudiating his confession at trial, he claimed that he became acquainted with the facts of the burglary from listening to the many discussions of it while he was in jail. The disbelief of his story in this regard by the trial judge and the jury is quite understandable.

Morgan remained in the Shelby County jail until March 8, 1966. No federal charge had been made against him up to that time. Morgan testified that sometime, on or prior to that date, he told Sheriff Blair that if he could be released on bail he would go and get the stolen bonds and deliver them to the sheriff. He also said that he promised to give FBI Agent Keenan a statement, as a condition of his release. Keenan denied that such a "deal" had been made and denied that Morgan was offered or promised anything in exchange for his statement. Sheriff Blair did assist Morgan to make the $2,000 bail, and he was released on March 8, 1966. Morgan's self-contradictory testimony at one point states that FBI agent Keenan advanced the sum of $300 needed to pay the bondsman. Keenan denied this and said he gave no assistance to Morgan in this regard.

Keenan was notified when Morgan was being released and met him when he came out of the jail. At that time no federal charges were pending against Morgan. It will be sufficient to say that Morgan did go with Keenan to the Memphis office of the FBI and there dictated a full confession to one of the stenographers in that office. Present while this was being done was Sheriff Blair, who had been called by agent Keenan, and another FBI agent. Keenan called a lawyer, Robert Pepper, who had made an appearance for Morgan, and told Pepper that Morgan was about to make a statement and that he could be present if he cared to. The lawyer declined. Thereupon, Morgan signed two papers as follows:

"I, Charles Morgan hereby waive my right to have my lawyer, Robert Pepper, present while I discuss my part of the Senatobia Chancery Court Clerk's office, Senatobia, Miss.

"Signed. Charles Morgan."

"I, Charles Morgan, have come to the Memphis, Tenn. office of the FBI (Federal Bureau of Investigation) of my own choice to talk with Special Agents of the FBI about a crime which they are investigating. I know that I am not under arrest and that I can leave this office if I wish to do so. I also know that I have a right to say nothing at all, that anything I do say may be used in a court of law, and that if I do say anything about a crime I have a right at any time to talk with a lawyer of my own choice, or anyone else to whom I might wish to speak, before saying it. I have been told of these rights today by Special Agent Charles M. Keenan of the FBI.

"Signed: Charles Morgan."

Morgan then proceeded to dictate an extensive account of the Senatobia affair and the transportation of the stolen bonds. He gave an account of the handling of the Treasury bonds after they arrived in Memphis and their coming into the possession of appellant Daniel Dresden DeFoe at the latter's establishment, known as the Casual Aire Lounge.

Dictation of the above statement took until about 5:00 P.M., too late for the stenographer to transcribe her notes, so it was arranged that Morgan would re-

turn the following day to sign the statement. He called Keenan the next day saying he was delayed but would be in. He did not return and admits that he had no intention of doing so; that his promise to get and return the bonds and his dictating the confession to the FBI was all part of a scheme to get out of jail and disappear. Morgan's next criminal enterprise was in the State of Illinois where, on March 10, 1966, two days after his flight from Memphis, he was engaged in activity eventuating in his plea of guilty to "assault to murder." He was brought from an Illinois prison for the involved trial which began on October 3, 1966.

■ Obedient to Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), District Judge Bailey Brown made his own determination, out of the presence of the jury, that the confession was voluntary, and submitted the same question to the jury under instructions not criticized by appellant. Morgan testified on both occasions that FBI agent Keenan promised that in exchange for the confession and return of the stolen bonds, he would see that pending, or threatened, federal charges would be dropped. Morgan also stated that after his release on bail Keenan really kept him in custody until he agreed to go to the FBI office and make a statement. Both Keenan and Sheriff Blair denied Morgan's account and testified that Morgan was not in custody or under any restraint or compulsion when he gave his statement to the FBI. Thus an issue of fact was resolved against Morgan by the District Judge and by the jury. There was clearly sufficient evidence to permit such findings.

■ In Davis v. State of North Carolina, 384 U.S. 737, 741–742, 86 S.Ct. 1761, 1764, 16 L.Ed.2d 895 (1966), we were admonished, as an appellate court, "to examine the entire record and make an independent determination of the ultimate issue of voluntariness." We have done so and have determined that Morgan's confession was voluntary. In do-

ing so we have followed the rule we recognized in our recent decision of United States v. Hindmarsh, 389 F.2d 137, 143 (6th Cir. 1968), viz: that attention should be given to the intellectual capacities, experience and sophistication of one who claims to have been put upon in confessing a crime.

Morgan was 26 years of age at the time of his trial, October 3, 1966. He had been schooled through the twelfth grade and professed to be a welder and iron worker. In 1957 he was dishonorably discharged from the United States Army. In 1960 he pleaded guilty to Tennessee charges of first and second degree burglary and was sentenced to six years. He finished serving his sentence on May 3, 1964. He was again placed in jail on October 29, 1965, under Tennessee charges. He was released on bond, October 31st. The crime at the Senatobia Courthouse occurred on November 30, 1965. Morgan was arrested on January 14, 1966, and was not released on bond until March 8, 1966. At that time he was under nine separate Tennessee charges, there was a warrant for him in Mississippi, and charges against him in Texas for the theft of an automobile. In April, 1966, Morgan pleaded guilty to "assault to murder" in Illinois for an offense he committed just two days after his March 8 release on bond in Tennessee.

We are not persuaded that Morgan's will was overborne. See Escobedo v. State of Illinois, 378 U.S. 478, 482, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964); Stein v. People of State of New York, 346 U.S. 156, 185–186, 73 S.Ct. 1077, 97 L.Ed. 1522 (1953); Reck v. Pate, 367 U.S. 433, 441–442, 81 S.Ct. 1541, 6 L.Ed.2d 948 (1961).

We affirm the judgment of conviction of Charles Morgan.

2. Appeal of Daniel Dresden DeFoe.

There was evidence that DeFoe received and sold the stolen Treasury bonds. He was tried with Morgan and several others, all of whom were charged

with some aspects of the theft, transportation or sale of the bonds. He presents three reasons for reversal. First, that his acquittal should have been directed. Second, that he should have been granted a severance. Third, that the court's charge to the jury contained error.

a) Sufficiency of evidence against De-Foe.

■ Morgan's confession told of his leaving the bonds with his attorney in Memphis immediately after returning from Mississippi; that after several weeks he brought them to Casual Aire Lounge, of which appellant DeFoe was the proprietor. Morgan's confession was not binding on DeFoe, but there was other evidence of Morgan and DeFoe together handling the stolen bonds at the Casual Aire Lounge sometime in the fall of 1965. DeFoe was connected with the bonds by the testimony of four witnesses besides Morgan.

DeFoe got the bonds from the thief, Morgan. Discussion was had concerning the sale of these bonds and prices of $2,000 and $1,000 were considered, even though these were bearer bonds of a face value of $30,000. From the time the bonds arrived at DeFoe's establishment until they were sold, they were handled by DeFoe and others in apparent effort to find a buyer for them. In late January or early February, 1966, DeFoe sold the bonds for $1,000. By the next day, DeFoe had closed up the Casual Aire Lounge and disappeared. This disappearance was also substantially contemporaneous with the arrival of the FBI at the Casual Aire Lounge. It is fair to say that from the time the stolen bonds were brought to DeFoe's place until they were sold by him they were very much in motion.

Appellant's basis for claim of insufficiency of the evidence is that the government's proofs failed to establish that when received by DeFoe the bonds "were moving as or which constituted interstate commerce from Senatobia, Mississippi, to Memphis, Tennessee" in that "when the bonds were turned over to Morgan's lawyer in Memphis, Tennessee, for safekeeping they ceased to be interstate commerce."

■ We consider that the leaving of the bonds for "safekeeping" with Morgan's lawyer, their delivery to DeFoe, and his handling the sale of them, were all part of the journey that began when Morgan and his accomplice stole them from the safe in Senatobia, Mississippi, and brought them to Tennessee. In Schwachter v. United States, 237 F.2d 640, 644 (6th Cir. 1956) Judge Shackelford Miller, Jr., speaking for this Court, and dealing with whether a stolen vehicle was in interstate commerce, said:

"It is recognized that the interstate movement of a car does not necessarily cease when the car stops and transportation of it into the other state ends. The sale thereafter may be an incident to the theft and transportation and so tied up with it as to constitute the final step of a continuous unlawful scheme."

He held that whether the car was in interstate commerce was a question for the jury. Such questions, as to the stolen bonds, were here submitted for the jury's factual resolution. The evidence warranted such procedure. United States v. Cardillo, 316 F.2d 606, 613–614, (2d Cir. 1963); Pearson v. United States, 378 F.2d 555, 559–560 (5th Cir. 1967). In Corey v. United States, 305 F.2d 232, 236–237 (9th Cir. 1962) the Court was considering the Mail Fraud Act and the National Stolen Property Act. Relevant to the question before us, the Court said:

"Once an interstate journey has begun, the question of whether it has come to an end is generally one of fact for the jury. The jury may find that property remained in interstate commerce although it has passed its initial stopping place within the state of destination."

See also Rugendorf v. United States, 376 U.S. 528, 536, 84 S.Ct. 825, 11 L.Ed.2d

887 (1964) and Wilson v. United States, 162 U.S. 613, 619, 16 S.Ct. 895, 40 L.Ed. 1090 (1896). We mention that the stolen bonds ultimately arrived at Atlanta, Georgia, where they were sold for approximately $27,000. This ended their journey.

b) Denial of severance.

Appellant DeFoe's motion for severance asserted as ground therefor that he had not theretofore been convicted of a felony as had most of the other defendants (we have not discussed the relevant activities of all of the others who were indicted with DeFoe); that Morgan and others had given statements that would prejudice DeFoe. Part of Morgan's confession involving DeFoe was deleted before it was read to the jury and the District Judge advised the jury as to the limitations upon their consideration of such confession.

■ The test for determining whether a motion for severance should be granted is the likelihood of substantial prejudice to the movant from being tried with others. And there is a "continuing duty at all stages of the trial to grant a severance if prejudice does appear." Schaffer v. United States, 362 U.S. 511, 516, 80 S.Ct. 945, 4 L.Ed.2d 921 (1960). From our own examination of the record, we are not persuaded that DeFoe was unduly prejudiced by the company with which he was tried.

■ In all events, the granting of severance is a matter within the discretion of the trial judge; only where such discretion has been abused will we find reversible error in its denial. Stilson v. United States, 250 U.S. 583, 585–586, 40 S.Ct. 28, 63 L.Ed. 1154, 1156 (1919); Opper v. United States, 348 U.S. 84, 95, 75 S.Ct. 158, 99 L.Ed. 101, 109–110 (1954); Anderson v. United States, 270 F.2d 124, 126 (6th Cir. 1959); United States v. Carter, 311 F.2d 934, 944 (6th Cir. 1963); United States v. Vida, 370 F.2d 759, 765 (6th Cir. 1966). We find no abuse of discretion here.

c) The Court's Instructions.

Error is charged in the District Judge's giving of the following instructions:

"I charge you that the bonds would be moving as and constitute interstate commerce when received or concealed or stored in Memphis if you find that they were stolen in Senatobia and transported to Memphis and if you find that the receipt of, or concealment of or storing of the bonds was incident to the theft and transportation and was tied up with the interstate transportation in the sense that it was part of a scheme to unlawfully dispose of the bonds and constituted a step in such disposition.

\*     \*     \*     \*     \*     \*

"And possession in one state of property recently stolen in another state, if not satisfactorily explained, is ordinarily a circumstance from which a jury may reasonably draw the inference and find, in the light of surrounding circumstances shown by the evidence in the case, that the person in possession not only knew it to be stolen property, but also transported it or caused it to be transported, in interstate commerce."

We have dealt with appellant's contention that the bonds were not moving in interstate commerce by the time he received them. Our treatment of that issue disposes of his objection to the first quoted portion of the charge.

■ Appraisal of the propriety of the latter part of the complained of instructions cannot be made unless the entire charge is considered. Without setting it out at length, we are satisfied that taken in connection with the entire charge, the foregoing excerpts do not disclose reversible error. If the final phrase, "but also transported it or caused it to be transported in interstate commerce" could be looked upon as error we would treat it as harmless error, under Rule 52(a) F.R.Crim.P.

Judgment affirmed.